# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031**

| | |
|---|---|
| Appellate Court Caption | KRAFT FOODS, INC., Petitioner, v. ILLINOIS PROPERTY TAX APPEAL BOARD, KANE COUNTY BOARD OF REVIEW, CITY OF AURORA, and WEST AURORA SCHOOL DISTRICT #129, Respondents. |
| District & No. | Second District<br>Docket No. 2-12-1031 |
| Filed | September 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal, respondent Property Tax Appeal Board's decision that the industrial property leased and used as a distribution center by petitioner had an assessed value of $13.3 million was upheld over petitioner's claim that the assessed value was $10.7 million, since weighing the evidence and determining the credibility of the witnesses were matters for the Board, and under the circumstances, the Board's decision, after considering the testimony of the appraisers presented by the parties, was not against the manifest weight of the evidence. |
| Decision Under Review | Petition for review of order of Illinois Property Tax Appeal Board, No. 07-03035.001-C-3. |
| Judgment | Confirmed. |

| | |
|---|---|
| Counsel on Appeal | Patrick C. Doody, of Law Offices of Patrick C. Doody, of Chicago, for petitioner. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Valerie J. Quinn, Assistant Attorney General, of counsel), for respondent Illinois Property Tax Appeal Board. |
| | Joshua S. Whitt and Brittany Flaherty Theis, both of Whitt Law LLC, of Aurora, for respondents City of Aurora and West Aurora School District #129. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1 This is an action for direct review of a final administrative decision of the Illinois Property Tax Appeal Board (PTAB or Board). In its decision, the PTAB concluded that, for purposes of tax year 2007, the industrial property leased and occupied by taxpayer Kraft Foods, Inc. (Kraft), had a total assessed value of $13,312,000, reflecting a fair market value of $40 million. Kraft, claiming an assessed value of $10,791,000 and a fair market value of $30 million, has appealed from the PTAB's decision. We confirm the PTAB's decision.

¶ 2                                     BACKGROUND

¶ 3 The property at issue is Kraft's industrial warehouse distribution center located at 1700 North Edgelawn Drive in Aurora Township, Kane County. The property consists of 2,160,822 square feet of land that is improved with an 860,248-square-foot, one-story, partially air-conditioned building constructed in 2003. The building contains 19,477 square feet of office space, with the 840,771-square-foot balance used as a warehouse distribution center. There are 93 exterior truck docks on the east and west elevations of the building. The land-to-building ratio is 2.51:1. The large amount of land area allows for ample parking: there are 307 customer/employee parking spaces, and 234 truck trailer parking stalls.

¶ 4 The property was encumbered by a 10-year build-to-suit lease agreement that commenced March 8, 2003. Kraft was the sole tenant and had options for two 10-year periods. The monthly rent for the first five years of the lease was $4.35 per square foot of building area. The lease was a triple-net lease, under which the tenant paid for utilities, taxes, insurance, and maintenance, and the landlord paid for structural repairs only. For the second five years

-2-

of the lease, the rent increased to $4.49 per square foot. In January 2006, in a bulk-sale transaction, the subject property sold for $62,858,000, or $73.07 per square foot.

¶ 5    On March 10, 2008, the Kane County Board of Review assessed the property for tax year 2007 at $13,679,281, which reflected a market value of $41,103,609. Kraft subsequently appealed the Board of Review's decision to the PTAB, arguing that the Board of Review's assessed value was excessive. The Board of Review did not respond to Kraft's appeal. However, both the City of Aurora and West Aurora School District #129 (collectively referred to as Aurora) were granted permission to intervene.

¶ 6    At the hearing before the PTAB, Kraft presented the testimony of appraiser Terrance McCormick. He estimated that the value of the subject property was $30 million. Aurora presented the testimony of appraiser James Gibbons. Gibbons estimated that the value of the subject property was $43.3 million. Below, we set forth only those facts necessary to an understanding of the issues in this appeal.

¶ 7                                    Kraft's Appraisal

¶ 8    McCormick, a real estate appraiser with 32 years' experience, testified that he applied the three traditional approaches to value in order to arrive at an estimate of the market value of the property. Under the cost approach, he arrived at an estimated value of $31 million. Under the income approach, he arrived at an estimated value of $29.3 million. However, he placed the most weight on the sales comparison approach. In conjunction with that approach, he considered five comparable sales.

¶ 9    Comparable Sale 1 was in Aurora, Naperville Township, Du Page County. It was a one-story, concrete-panel-constructed, multiple-tenant warehouse distribution industrial building containing 315,799 square feet and situated on a 739,213-square-foot parcel of land. The building was constructed in 2000 and had 1.8% office space, 32-foot clear ceiling heights, 37 exterior truck-height docks, 3 drive-in truck doors, and a sprinkler system. The building was in average physical condition for its age. The building was last sold in December 2007 for $12.8 million. The unit price was $40.53 per square foot of building area, including land.

¶ 10   Comparable Sale 2 was in Aurora, Aurora Township, Kane County. It was a one-story, concrete-panel-constructed, multiple-tenant warehouse distribution industrial building containing 383,948 square feet and situated on a 780,595-square-foot parcel of land. The building was constructed in 2002 and had 1% office space, 30-foot clear ceiling heights, 41 exterior truck-height docks, 2 drive-in truck doors, and a sprinkler system. The building was in average physical condition for its age. The building was last sold in April 2007 for $18.1 million. The unit price was $47.14 per square foot of building area, including land.

¶ 11   Comparable Sale 3 was in Romeoville, Will County. It was a one-story, concrete-panel-constructed, multiple-tenant warehouse distribution industrial building containing 471,453 square feet and situated on a 1,000,573-square-foot parcel of land. The building was constructed in 2004 and had 2% office space, 30-foot clear ceiling heights, 48 exterior truck-height docks, 3 drive-in truck doors, and a sprinkler system. The building was in average physical condition for its age. The building was last sold in June 2006 for $16,502,500. The unit price was $35 per square foot of building area, including land.

¶ 12 Comparable Sale 4 was in Joliet, Will County. It was a one-story, steel-framed, concrete-panel-constructed, multiple-tenant warehouse distribution industrial building containing 474,432 square feet and situated on a 1,446,323-square-foot parcel of land. The building was constructed in 2006 and had 2% office space, 30-foot clear ceiling heights, 140 exterior truck-height docks, 4 drive-in truck doors, and a sprinkler system. The building was in average physical condition for its age. The building was last sold in February 2007 for $18.25 million. The unit price was $38.47 per square foot of building area, including land.

¶ 13 Comparable Sale 5 was in Romeoville. It was a one-story, steel-framed, concrete-panel-constructed, multiple-tenant warehouse distribution industrial building containing 652,056 square feet and situated on a 1,151,421-square-foot parcel of land. The building was constructed in 2007 and had 2% office space, 30-foot clear ceiling heights, 76 exterior truck-height docks, 3 drive-in truck doors, and a sprinkler system. The building was in average physical condition for its age. The building was last sold in December 2007 for $12.8 million. The unit price was $40.53 per square foot of building area, including land.

¶ 14 McCormick testified that under the sales comparison approach the subject property had a value of $35 per square foot of building area, including land, or $30.1 million. In reconciling the three approaches to valuation, he concluded that the subject property had a value of $30 million.

¶ 15 In giving his opinion, McCormick acknowledged that the comparable sale and rental properties were significantly smaller than the subject property. He stated that, in general, the larger the building, the lower the rent per square foot. He also stated that a large building with a single tenant carries a higher degree of risk. He acknowledged, however, that there is very little risk associated with a build-to-suit lease for a triple-A-rated tenant. He further testified that it was appropriate to consider properties 30 miles away from the subject property because, if a purchaser were seeking to "buy or lease a large building like the subject property, their market would be the entire Chicago region."

¶ 16                                            Aurora's Appraisal

¶ 17 Gibbons, a real estate appraiser with approximately 30 years' experience, testified that he applied the three traditional approaches to value in order to arrive at an estimate of the market value of the property. Under the cost approach, he arrived at an estimated value of $46,585,000. Under the income approach, he arrived at an estimated value of $43.7 million. However, he placed the most weight on the sales comparison approach. In conjunction with that approach, he considered six comparable sales.

¶ 18 Comparable Sale 1 was the subject property.

¶ 19 Comparable Sale 2 was in Aurora. It was a one-story, precast-concrete-constructed, multiple-tenant warehouse distribution industrial building containing 607,752 square feet and situated on a 1,306,800-square-foot (30 acre) parcel of land. The building was constructed in 2005 and had 1.3% office space, 32-foot clear ceiling heights, 80 exterior truck-height docks, 4 drive-in truck doors, 380 parking spaces, and a sprinkler system. The building was last sold in April 2006 for $29.6 million. The unit price was $48.70 per square foot of building area.

¶ 20    Comparable Sale 3 was the same as McCormick's Comparable Sale 2.

¶ 21    Comparable Sale 4 was the same as McCormick's Comparable Sale 1.

¶ 22    Comparable Sale 5 was in Aurora. It was a one-story, concrete-panel-constructed, single-tenant industrial warehouse containing approximately 694,367 square feet and situated on a 1,485,880-square-foot parcel of land. The building was constructed in 1999 and had 3% office space, 30- to 40-foot clear ceiling heights, 74 exterior truck-height docks, 2 drive-in truck doors, 167 car parking spaces, trailer spaces, and a sprinkler system. The building was last sold in January 2005 for $32.25 million. The unit price was $46.45 per square foot of building area.

¶ 23    Comparable Sale 6 was in Aurora. It was a one-story, precast-concrete-constructed, single-tenant industrial warehouse building containing approximately 530,937 square feet and situated on a 1,659,349-square-foot parcel of land. The building was constructed in 1997 and had 3.1% office space, 30-foot clear ceiling heights, 88 exterior truck-height docks, and 2 drive-in truck doors. The building had 52,000 square feet of air-conditioned warehouse space. The building was last sold in March 2007 for $28,064,000. The unit price was $52.85 per square foot of building area. Comparable Sale 6 was a property leased by Kraft that was previously sold in the same bulk-sale transaction as Comparable Sale 1. As to that transaction, Gibbons did not allocate a value to each parcel, and he did not know how that could be done.

¶ 24    Based upon the sales comparison approach, Gibbons estimated the value of the subject property at $43.3 million. In reconciling the three approaches to valuation, he concluded that the subject property had a value of $43.3 million.

¶ 25                              Kraft's Rebuttal

¶ 26    Anthony Uzemack testified that he had been retained for the purpose of conducting a desk review of Gibbons' appraisal. He did not review McCormick's appraisal. Uzemack stated that it was very difficult to determine market value for property such as the subject property. Such properties are not fee-simple "transactions" but investment schemes and should be treated as leased-fee sales. He noted that the subject property's contract rent was high, even characterizing it as "on the moon." He testified that there were few large warehouses in existence, which made the market narrow and limited.

¶ 27    Uzemack considered Gibbons' sales comparison approach to be weak. He stated that Comparable Sales 1 and 6 were leased-fee bulk-sale transactions involving the subject property and another property. He asserted that Comparable Sales 2, 3, and 5 had been put together as leased-fee transactions by Liberty Property LLC, one of the largest real estate investment trust (REIT) firms in the country for corporate warehouse distribution facilities. He believed that those sales should be eliminated. That left Comparable Sale 4, a property smaller than the subject property, the size of which put it in a different market.

¶ 28    On cross-examination, Uzemack acknowledged that he did not know which other properties in the market were similar to Kraft's in terms of size, nor did he know which ones were single-tenant properties. He did not know whether Kraft's lease was a publicly available record. He did not know the terms of the subject property's sale.

¶ 29    Uzemack testified that the sizes of the properties compared in Gibbons' appraisal were a "large component" of his conclusion that the properties were not really comparable to the subject property. He acknowledged that the subject property was "big," but he did not believe that it was "unique." He also acknowledged that Gibbons' descriptions of the compared properties were accurate; Gibbons' appraisal contained no mathematical errors; and Gibbons had extracted capitalization rates from actual sales as well as from surveys.

¶ 30    Uzemack additionally testified that it was proper to use as a comparable sale a property that was leased at the time of its sale as long as its rent was at market level. He also noted that the property did not have to be vacant at the time it was sold in order to be considered as a comparable sale property.

¶ 31                                    The PTAB's Decision

¶ 32    The PTAB concluded that a reduction in the assessment of the property as established by the Board of Review was warranted. It found the property's estimated fair market value, as of January 1, 2007, to be $40 million.

¶ 33    In arriving at its conclusion, the PTAB noted various points of agreement between the two appraisers. Both McCormick and Gibbons agreed about the description of the improvements to the property, both had applied the three traditional approaches to value, and both had ranked those in the same order, attributing the greatest weight to the sales comparison approach, with the income approach ranking second. Both appraisers valued the land at $2 per square foot, and both were in near-agreement on the cost of replacing the improvements. The PTAB agreed with both appraisers that the $62 million sale price of the property did not reflect its fair market value.

¶ 34    In considering the replacement cost approach, the PTAB determined that the subject property had a value of $45,257,813. In considering the income approach, the PTAB determined that the subject property had a value of $40.9 million.

¶ 35    In considering the sales comparison method, the PTAB noted that Gibbons' Comparable Sale 3 was the same as McCormick's Comparable Sale 2. (The record also reveals that Gibbons' Comparable Sale 4 was the same as McCormick's Comparable Sale 1.) The PTAB considered all of the five sales McCormick had offered, which were located in Aurora, Romeoville, and Joliet. They were improved with multitenant warehouse buildings ranging from 315,799 to 652,056 square feet, and sold between June 2006 and December 2007 for prices ranging from $35 to $47.14 per square foot including land. The PTAB assigned less weight to the sales farthest away from the subject property, which sold for the lowest unit prices.

¶ 36    The PTAB considered the six sales that Gibbons had used. It gave no weight to Comparable Sales 1 and 6, because those sales were of the subject property and another property in a bulk-sale transaction. The four remaining properties were improved with one-story industrial warehouse buildings that ranged in size from 320,047 to 694,367 square feet and were built between 1999 and 2005. Three were multitenant buildings and one was a single-tenant property.

¶ 37    The PTAB found that the most probative sales were, like the subject property, located

-6-

in Aurora and had unit prices ranging from $39 to $48.70 per square foot of building area, including land. Taking into consideration the size and multitenant configuration of some of the properties, the PTAB found that downward adjustments of price would be justified for comparison's sake. Further, the Board found that Gibbons' Comparable Sale 5 was the most comparable to the subject property. It was a single-tenant building with 694,367 square feet of building area that was leased for $3.75 per square foot at the time it sold and had a unit value of $46.45 per square foot of building area, including land. The subject property's assessment reflected a unit value of $47.48 per square foot of building area, including land. Based on comparable sales, the Board found that Kraft's property had a unit value of $46 per square foot of building area, including land, which was the equivalent of $39.6 million rounded.

¶ 38       After considering the testimony, and the different approaches to value, giving most emphasis to the evidence of the sales in the record, the PTAB found that the property had a market value of $40 million on January 1, 2007.

¶ 39       Kraft filed a timely notice of appeal.

¶ 40                      ANALYSIS

¶ 41                   Standard of Review

¶ 42       The findings of an administrative agency are *prima facie* correct in a case such as this, and the court should not intervene in a case where property has been assessed higher or lower than it should have been through a mere error of judgment by the administrative agency. *Chrysler Corp. v. Illinois Property Tax Appeal Board*, 69 Ill. App. 3d 207, 210 (1979). However, where the court is faced with potential use of an improper method of valuation, rather than with a mere difference of opinion as to the market value of a particular parcel, courts have intervened. *Chrysler*, 69 Ill. App. 3d at 210-11.

¶ 43       Illinois law requires that all real property be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale where the owner is ready, willing, and able to sell but is not compelled to do so, and the buyer is likewise ready, willing, and able to buy but is not forced to do so. *Chrysler*, 69 Ill. App. 3d at 211. "Fair cash value" is synonymous with fair market value, and an arm's-length sales transaction is the best evidence thereof. *Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 230 (1998). There are three basic methods of evaluating real property: (1) the sales comparison approach; (2) the income approach; and (3) the reproduction cost approach. *Chrysler*, 69 Ill. App. 3d at 211. In the absence of market value established by a contemporaneous arm's-length sale, the sales comparison approach is the preferred method and should be used when market data are available. *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480-81 (2008) (*Omni*). The sales comparison approach relies on sales of comparable properties in the open market to reach a determination of the subject property's fair cash value. *Omni*, 384 Ill. App. 3d at 481. The existence of market data to determine fair cash value is central to the sales comparison (also called market) approach. *Omni*, 384 Ill. App. 3d at 481. The income method is based on the property's income-producing potential and divides the property's net income by a capitalization rate, which is a return on and of capital, as determined by market

data. *Department of Transportation v. Drury Displays, Inc.*, 327 Ill. App. 3d 881, 885 (2002). Generally, the reproduction cost approach should be emphasized only in the context of some special-purpose property, which is defined as property of such a nature and applied to such a special use that it cannot have a market value. *Chrysler*, 69 Ill. App. 3d at 212.

¶ 44   Kraft's first argument on appeal is that the PTAB erred as a matter of law in relying on leased-fee bulk-sale transactions, not listed on the open market, to find the market value for the subject property. Kraft frames this issue as whether the PTAB considered appraisals that applied the proper methodology for the valuation of the subject property. This is a legal question that we would review *de novo*. *Board of Education of Meridian Community Unit School District No. 223 v. Illinois Property Tax Appeal Board*, 2011 IL App (2d) 100068, ¶ 35 (*Onyx*). In response, the PTAB asserts that there is really no issue as to whether the proper valuation method was employed. The PTAB points out that Kraft does not dispute that it was appropriate for the appraisers and the PTAB to consider all three methods to value the property, nor was it improper for everyone, including the PTAB, to give the sales comparison approach the most weight. The PTAB argues that Kraft's real contention is that the PTAB erred in placing greater weight on Gibbons' testimony than it did on McCormick's and Uzemack's. As such, the appropriate standard of review of the PTAB's decision should be whether that decision is against the manifest weight of the evidence.

¶ 45   In its reply brief, Kraft insists that the PTAB is mischaracterizing its argument. Kraft argues that the problem with the PTAB's approach to determining the value of the property was twofold. First, Kraft contends that the PTAB erred in considering comparables "that did not reflect the fair market value of the fee simple absolute." Second, Kraft argues that the PTAB erred in "mixing and matching the comparable properties from two appraisals" and in essence creating its own appraisal. Kraft maintains that the PTAB "is to weigh the evidence and then decide which party has presented the more compelling evidence; it does not permit the PTAB to create its own evidence and substitute it for those offered by trained experts." Kraft therefore concludes that the PTAB's purported errors should be reviewed *de novo*.

¶ 46   We find Kraft's argument to be without merit. First, in arguing that the PTAB erred in relying on improper comparable-sale appraisals, Kraft's contention is premised on the notion that the PTAB should not have relied on five of Gibbons' comparable-sale appraisals, because Uzemack testified that those appraisals had not been done in a way to reflect actual market value. However, Gibbons specifically testified that his comparable-sale appraisals did reflect actual market value. Thus, as Kraft is essentially arguing that the PTAB should have placed greater weight on Uzemack's testimony than on Gibbons', we will not disturb the PTAB's decision unless it is against the manifest weight of the evidence. See *Kankakee County Board of Review v. Illinois Property Tax Appeal Board*, 337 Ill. App. 3d 1070, 1074 (2003) (*United Coatings*).

¶ 47   Second, we reject Kraft's contention that the PTAB erred in choosing to accept some evidence and rejecting or discounting other evidence. Despite Kraft's protests to the contrary, it was not inherently improper for the PTAB to credit some of the evidence that both parties presented. Kraft cites no authority for the proposition that the PTAB must accept evidence from only one of the parties in a valuation dispute. Indeed, such an argument is contrary to

existing precedent. See, *e.g.*, *Kankakee County Board of Review v. Property Tax Appeal Board*, 2012 IL App (3d) 110045, ¶¶ 6, 8, 10 (*Armstrong*) (taxpayer's appraiser testified that subject property was worth between $2.9 million and $3.15 million; county's appraiser testified that property was worth between $8.6 million and $10.4 million; PTAB determined that property was worth $3.96 million); *Onyx*, 2011 IL App (2d) 100068, ¶¶ 4, 31 (taxpayer's appraisers testified that subject property was worth either $10.66 million or $9.6 million; appraiser for school district testified that property was worth $25.9 million; PTAB determined that property was worth $10 million); *Kendall County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 735, 739 (2003) (*AT&T*) (PTAB found that each of the appraisals submitted was more valid than the other one as to certain points; PTAB determined that subject property was worth different amount than either of the appraisers had concluded).

¶ 48    We note that none of the aforementioned cases explain why the PTAB may consider conflicting appraisals and conclude that the property is worth a different amount than what any of the experts testified to. We believe that the reasoning of those cases is implicitly based on the weight-of-the-evidence concept, which requires the trier of fact to find whether the greater amount of credible evidence presented sustains the issue that is to be established. Black's Law Dictionary 1594 (6th ed. 1990). In making such a determination, the trier of fact may find that both parties presented credible evidence as to a certain issue. That the trier of fact ultimately determines that one party presented more credible evidence than the other does not require it to discount all the evidence that the other party presented. Thus, the PTAB's conclusion that the property was worth a different amount than any of the appraisers determined does not require us to employ a *de novo* standard of review. See *AT&T*, 337 Ill. App. 3d at 739. Accordingly, as stated above, we will not disturb the PTAB's decision unless it is against the manifest weight of the evidence. *United Coatings*, 337 Ill. App. 3d at 1074.

¶ 49                    Whether the PTAB's Findings Are Against
                        the Manifest Weight of the Evidence

¶ 50    Kraft next argues that, even if the *de novo* standard of review is not applied, the PTAB's decision is against the manifest weight of the evidence. Specifically, Kraft argues that the PTAB erred in (1) placing any weight on Gibbons' Comparable Sales 2, 3, and 5, because those comparables were based on leased-fee bulk-sale transactions; and (2) excluding from consideration McCormick's Comparable Sales 3, 4, and 5, just because those comparables were based on properties outside of Aurora.

¶ 51    As stated above, the PTAB's finding regarding the property's fair market value will not be reversed unless it is against the manifest weight of the evidence, which occurs only where "all reasonable and unbiased persons would agree that the decision is erroneous and that an opposite conclusion is clearly evident." *United Coatings*, 337 Ill. App. 3d at 1074. Moreover, weighing evidence and determining the credibility of witnesses are jobs of the PTAB and are uniquely in its province. *AT&T*, 337 Ill. App. 3d at 737. Thus, on administrative review, this court does not reweigh the evidence, reassess the credibility of the witnesses, substitute its judgment for that of the PTAB, or make an independent determination of the facts. *AT&T*,

337 Ill. App. 3d at 737. This court will not disturb the PTAB's findings where there exists simply a difference of opinion regarding the actual value of the property. *County of Du Page v. Property Tax Appeal Board*, 303 Ill. App. 3d 538, 541 (1999).

¶ 52    Here, the PTAB placed the most weight on the comparable sales method, which was appropriate. *Omni*, 384 Ill. App. 3d at 480-81. In doing so, it also placed the most weight on the comparable sales that were in Aurora (four of Gibbons' and two of McCormick's). The PTAB found that those sales had varying degrees of similarity to Kraft's property, with the primary differences being in size and multitenant configuration. The PTAB found that, in particular, Gibbons' Comparable Sale 5 was the most similar to the subject property because it was a large distribution warehouse nearly equal to Kraft's in size and was leased to a single tenant at market rent. It placed less weight on McCormick's three comparables that were not in Aurora, not only because they were 25 to 30 miles away from the subject property, but because they were smaller than the subject property. As all of the PTAB's findings are supported by the record, we cannot say that its decision is against the manifest weight of the evidence.

¶ 53    In so ruling, we reject Kraft's contention that the PTAB erred in considering Gibbons' Comparable Sale 3. We observe that Gibbons' Comparable Sale 3 was the same as McCormick's Comparable Sale 2, something that Kraft specifically asked the PTAB to consider. Kraft, thus, cannot now complain that the PTAB erred in considering McCormick's Comparable Sale 2. See *Byer Clinic & Chiropractic, Ltd. v. State Farm Fire & Casualty Co.*, 2013 IL App (1st) 113038, ¶ 20 (party is judicially estopped from assuming a position in a legal proceeding contrary to a position it held in a prior legal proceeding).

¶ 54    We also reject Kraft's contention that the PTAB erred in placing any weight on Gibbons' Comparable Sales 2 and 5 (as well as Comparable Sale 3) because those were leased-fee bulk-sale transactions. Such transactions occur when a property is sold to real estate investors in order to collect rental income. The transactions do not necessarily reflect market value. Kraft's argument as to this point is essentially that the PTAB should have placed more weight on Uzemack's testimony than on Gibbons' and McCormick's. Uzemack testified that the leases as to Gibbons' Comparable Sales 2, 3, and 5 were not at market rate when they sold. Gibbons testified that they were. McCormick's testimony also indicated that Gibbons' Comparable Sale 3 was at market rate. As it was within the PTAB's discretion to place more weight on Gibbons' and McCormick's testimony than on Uzemack's, we will not disturb the PTAB's ruling as to this point. See *AT&T*, 337 Ill. App. 3d at 737.

¶ 55    We further reject Kraft's argument that the PTAB's decision was internally inconsistent. Kraft argues that Gibbons' Comparable Sales 1, 2, 3, 5, and 6 were all leased-fee bulk-sale transactions. As the PTAB specifically refused to give any weight to Comparable Sales 1 and 6, Kraft argues that the PTAB's decision was inconsistent when it nonetheless considered Comparable Sales 2, 3, and 5. We do not find the PTAB's decision to be internally inconsistent. The PTAB refused to give any weight to Comparable Sales 1 and 6 because those sales involved the subject property and a property that was involved with it in the same sales transaction. The PTAB's refusal to consider those properties was unrelated to its consideration of any of the other properties that Gibbons and McCormick submitted as comparables.

¶ 56    We next consider Kraft's argument that the PTAB erred in "excluding" three of McCormick's comparables only because they were outside of Aurora. Kraft insists that because McCormick testified that an entity wanting to use a large warehouse would consider the entire Chicago area as the market for such a warehouse, and because that testimony was unrebutted, the PTAB was obligated to place significant weight on those comparables.

¶ 57    We first observe that Kraft mischaracterizes the PTAB's findings. The PTAB did not indicate that it was excluding those three comparables. Rather, it just indicated that it was placing less weight on those properties because they were not close to the subject property. The PTAB also found that those properties had lower values than the properties in Aurora that both McCormick and Gibbons had considered as comparables. We also note that the record indicates that the subject property was close to an interstate highway, something that Gibbons indicated increased the value of the property. Although McCormick testified that his Comparable Sale 3 in Romeoville was close to I-55, he indicated that his Comparable Sale 4 in Joliet was in an inferior location to the subject property. McCormick did not indicate how close the property in Comparable Sale 5 was to an interstate. As we cannot say that all reasonable people would take a different position than the PTAB did in placing less weight on the properties outside of Aurora, the PTAB's decision on this point is not against the manifest weight of the evidence. See *United Coatings*, 337 Ill. App. 3d at 1074.

¶ 58    As to Kraft's argument that the PTAB was obligated to place greater weight on the three properties outside of Aurora because no one rebutted McCormick's testimony that the entire Chicago area was the market for someone looking for a large warehouse (and therefore the properties outside of Aurora were indeed comparable), we note that Kraft cites no authority for the proposition that a trier of fact must accept certain testimony just because it is unrebutted. Indeed, if Kraft's argument were valid, it would remove some of the discretion from the trier of fact as to how much weight should be afforded various evidence. That we decline to do. *Cf. People v. McCoy*, 140 Ill. App. 3d 868, 873 (1986) (jury was free to reject any or all of defendant's testimony even though it was not directly contradicted by other eyewitnesses).

¶ 59    Finally, we find Kraft's reliance on *Armstrong*, 2012 IL App (3d) 110045, to be misplaced. In that case, the reviewing court noted that the subject property was old, as one of the appraisers had described it as having a "40-year weighted age." *Armstrong*, 2012 IL App (3d) 110045, ¶¶ 3, 6. Further, it had been owned and occupied by Armstrong since construction, and it was "unique," having been built to manufacture floor tiles in a "fairly uncommon vertical manufacturing" process. *Armstrong*, 2012 IL App (3d) 110045, ¶ 3. That process required a "very tall facility, which would not be useful for many potential industrial users." *Armstrong*, 2012 IL App (3d) 110045, ¶ 3. The subject property's unique characteristics of age, size, multiple stories, and vertical "rack warehouse system" complicated the task of finding suitable comparable sales. *Armstrong*, 2012 IL App (3d) 110045, ¶¶ 6-7. Based on the unique nature of the subject property, the taxpayer submitted comparable sales that were farther away from the subject property. *Armstrong*, 2012 IL App (3d) 110045, ¶ 7. The board of review submitted comparables that were closer but had multitenant configurations. The PTAB ruled in favor of the taxpayer, finding that the multitenant properties that the board of review had submitted were not comparable to

Armstrong's owner-occupied single-user vertical-manufacturing facility. The PTAB also specifically explained that the board of review's expert had provided no information regarding the lease terms, their lengths, or any other details for those multitenant comparable sales. *Armstrong*, 2012 IL App (3d) 110045, ¶ 9. The reviewing court confirmed the PTAB's decision, noting that " '[i]f there is any evidence which fairly supports the agency's findings, the decision must be sustained on review.' " *Armstrong*, 2012 IL App (3d) 110045, ¶ 17 (quoting *Illini Country Club v. Property Tax Appeal Board*, 263 Ill. App. 3d 410, 417 (1994)).

¶ 60    Here, Kraft argues that the PTAB should have considered comparable sales that were farther away from the subject property, just as it did in *Armstrong*. However, in this case, unlike in *Armstrong*, one of the taxpayer's own experts testified that the subject property was not unique. Indeed, both McCormick and Gibbons submitted several comparable properties that were located in Aurora. Further, unlike in *Armstrong*, the expert here opposing the taxpayer (Gibbons) provided sufficient information regarding the lease terms of the comparable properties. Finally, we note that in *Armstrong*, based on the substantial deference to which the PTAB's decisions are entitled, the reviewing court confirmed the PTAB's decision. Applying that same standard of review to the case herein, and for the reasons set forth above, we also find that the PTAB's decision should be confirmed.

¶ 61                                           CONCLUSION

¶ 62    For the foregoing reasons, the decision of the PTAB is confirmed.

¶ 63    Confirmed.