**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190477

Order filed June 22, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| JOLIET TOWNSHIP HIGH SCHOOL DISTRICT 204, | ) ) ) | Appeal from the Illinois Property Tax Appeal Board |
| Petitioner-Appellant, | ) ) | Appeal Nos. 3-19-0477 3-19-0478 |
| v. | ) ) | |
| | ) | Circuit Nos. 14-00290.001-C-3 |
| ILLINOIS PROPERTY TAX APPEAL BOARD, | ) ) | 15-00588.001-C-3 |
| | ) | |
| Respondent-Appellee. | ) | |

_____

JUSTICE LYTTON delivered the judgment of the court.
Justices Holdridge and Wright concurred in the judgment.

_____

**ORDER**

*Held*: Decisions of Illinois Property Tax Appeal Board (PTAB) to reduce tax assessments of nursing home were not against the manifest weight of the evidence despite PTAB's failure to determine the precise building and lot sizes of the property where the evidence presented by a licensed appraiser showed that regardless of the building and lot sizes, the assessed values of the property were too high.

¶ 1 The Parc at Joliet, the owner of a nursing home in Will County, challenged the county's

assessments of the value of its building for the 2014 and 2015 tax years. The Will County Board

of Review affirmed the assessments. The Parc filed an appeal with PTAB. Petitioner Joliet Township High School District 204 (District 204) intervened in the appeal. PTAB found that Will County overvalued the property in tax years 2014 and 2015 and ordered the assessments to be reduced. District 204 appealed, arguing that PTAB's decisions were against the manifest weight of the evidence. We affirm.

¶ 2                                   BACKGROUND

¶ 3        The subject property is a skilled nursing facility in Joliet. The facility has 203 beds, of which 8 are private and 195 are semi-private. In addition to residential rooms, the facility has therapy and dialysis areas, nursing stations, a dining room, kitchen, laundry, administrative offices, and utility areas. Most of the building was constructed in 1969, with additions built in 2011. The parking lot of the facility contains approximately 63 parking spaces. The Joliet Township property record card for the property lists the building size as 63,894 square feet. The property record card lists the lot size of the property as 2.4393 acres. An Illinois Real Estate Transfer Declaration completed in 2007 lists the lot size of the property as 2.32 acres.

¶ 4        For tax years 2014 and 2015, Will County assessed the subject property at $1,456,659, with the value of the land assessed at $194,573, and the value of the building assessed at $1,262,086. The Parc challenged the county's assessment by filing an appeal with the Will County Board of Review. The Board of Review affirmed the assessment.

¶ 5        The Parc filed appeals with PTAB for tax years 2014 and 2015. The Parc did not contest Will County's assessment of the land but contested the value of the building itself and the value of the total property. In its 2014 appeal, The Parc asserted that the assessed value for its building should be reduced to $472,027, for a total assessed value of $666,660 for the entire property. In its

2015 appeal, The Parc asserted that its building should be assessed at $338,707 for a total property assessment of $533,280. District 204 filed requests to intervene, which PTAB granted.

¶ 6        The Parc provided PTAB with a 180-page appraisal authored by John VanSanten and Nicholas McGinn, in which they determined the value of the entire subject property was $2,000,000. In response, the Will County Board of Review provided PTAB with two eight-page documents, plus exhibits, from the Joliet Township Assessor's Office, arguing that the appraisal submitted by The Parc "should be given little or no weight." According to the Board of Review's documents, signed by Joliet Township Assessor Jim Brenczewski and Deputy Assessor Dale D. Butalla, the subject property had a value of $4,600,000 in 2014, and $5,000,000 in 2015.

¶ 7        On May 30, 2018, PTAB held a consolidated hearing on The Parc's appeals for the 2014 and 2015 tax years. The Parc's first witness was David M. Aronin, a certified financial planner who provides financial and clinical consulting to nursing homes. He testified that he has reviewed financial information for nearly 100 nursing facilities. He believed The Parc was not more financially successful because of the age of the facility and the lack of bathing facilities in every room. He testified that these features of the facility prevent it from attracting higher paying residents, including Medicare recipients.

¶ 8        The Parc's second witness was Charles Slagle, a nursing home administrator, who has been operating the Parc since 2013. In 2014 and 2015, The Parc had an occupancy rate of 65%, which Slagle attributed to the age of the facility and its poor reputation in the community. Two features of the facility preventing it from attracting new residents are the lack of (1) bathing facilities in resident rooms, and (2) private rooms for each resident. While newer facilities have full bathrooms attached to each resident room, The Parc has a common shower/bath facility that residents share. Additionally, the Parc has only eight private rooms, which are reserved for residents who must be

3

isolated because of medical conditions, such as infections. The remainder of The Parc's rooms are semi-private, shared by two residents. Slagle estimated that the average occupancy rate of nursing homes in Illinois is 75-80%.

¶ 9    The Parc's third witness was John VanSanten, a certified real estate appraiser licensed in Illinois and other states. He has worked as an appraiser for 26 years and has authored thousands of appraisals, including hundreds for nursing homes. Approximately 90% of his work involves valuing health care real estate, including nursing homes. PTAB accepted him as an expert in appraising real estate and, specifically, in appraising nursing homes.

¶ 10    VanSanten performed appraisal reports of the subject property in 2014 and 2015, opining that the facility had a value of $2,000,000 in both years. He testified that 95% of the facility was 45 years old in 2014, while a 3,500-square-foot addition added in 2011 represented 5% of the building, resulting in a weighted age of 43 years in 2014. After touring the facility, he found the square footage stated on the property record card was incorrect. He determined the building consists of 61,095 square feet and the lot consists of 2.42 acres.

¶ 11    VanSanten described the facility as being in fair to average condition overall. He noted the building showed significant wear and tear in some areas. He determined the effective age of the property was 35 years because of maintenance issues as well as the functional obsolescence in the building design because of shared rooms.

¶ 12    In preparing his appraisal, VanSanten used three approaches to determine the value of the subject property: (1) the cost approach, (2) the income approach, and (3) the sales comparison approach. He testified that he gave primary consideration to the cost approach because nursing homes are special purpose properties. Under the cost approach, VanSanten determined the value

4

of the land for the subject parcel was $580,000, which was consistent with Will County's 2014 and 2015 assessments of the land value of the subject property ($583,000).

¶ 13       VanSanten used cost estimates from the Marshall Valuation Service cost manual to determine the replacement cost of the facility to be $10,856,175. He then estimated depreciation by using the age/life method, requiring him to divide the effective age of the facility (35 years) by its 40-year economic life, as stated in Marshall, resulting in a depreciation of 87.5%. He determined the depreciation cost of the new building to be $1,357,384. He then added in the land value and depreciation costs for improvements, such as sidewalks and the asphalt parking lot, and determined the final value of the property to be $2,000,000 under the cost approach.

¶ 14       Under the income capitalization approach, VanSanten determined the per bed daily rate for the facility to be $135 per bed. He factored in the current occupancy rate of the facility (65%) to determine the income generated from the facility. He concluded the value of the subject real estate to be $2,000,000 under this approach.

¶ 15       Finally, VanSanten testified that he gave minimal weight to the sales comparison approach because sales of nursing homes often include intangible assets and personal property. Nevertheless, he found the approach to be a good check on value. VanSanten used four comparable sales of nursing homes and, after making adjustments for "market conditions" and "other/economic factors," he determined that the sales prices for the comparable properties ranged from $17,022 to $22,457 per bed. VanSanten concluded that the market value of the subject property was $18,000 per bed. After subtracting intangible assets and factoring in depreciation of personal property, VanSanten concluded the market value of the facility under the sales comparison approach was $2,150,000.

¶ 16    After reconciling the three approaches, VanSanten concluded the property's fair market value in 2014 and 2015 was $2,000,000. In making this determination, VanSanten testified that the most important consideration in valuing a nursing home is not the square footage of the facility but the number of beds. He stated: "It's not meaningful to look at [the value of a nursing home] on a square foot basis. It's really on a per bed basis."

¶ 17    The Board of Review's sole witness was Dave Butalla, who has worked in the Joliet Township Assessor's Office since 2014 and has been in the assessment field since 1993. He is not a licensed appraiser and has completed only one "full-blown" appraisal of a business. He admitted he had never appraised a nursing home. Nevertheless, he prepared a report on the subject property, using the same three valuation approaches as VanSanten. Butalla testified that he measured the facility and determined it to be 63,684 square feet. However, he admitted that his valuations incorrectly used a square footage of 63,894 based on information contained in the property record card. He determined the lot size to be 2.4393 acres based on the property record card.

¶ 18    Butalla testified that he did not perform a cost approach analysis but used Marshall & Swift tables to determine that the cost to build the facility new was $10,239,474 in 2014. He then determined the economic life of the building was 60 years based on nursing homes in Joliet and "buildings in general," not the Marshall & Swift determination of 40 years. Butalla found the subject property's effective age was 30 years based on his calculations. Using the depreciation rate of 50% for most of the property, Butalla concluded that the value of the property under the cost approach was $3,808,212 in 2014.

¶ 19    Under the income capitalization approach, Butalla determined the market value of the building was $4,745,318.85 in 2014. In reaching this conclusion, he used the same per bed daily

6

rate as VanSanten of $135 per bed but employed a higher occupancy rate of 78% based on the average occupancy rate of facilities in the area, not the 65% occupancy rate of the subject property.

¶ 20    Under the comparable sales approach, Butalla concluded that the subject property had a value of $22,500 per bed for a total market value of $4,575,000 in 2014. After reconciling the three values, Butalla concluded that the fair market value of the subject property was $4,600,000 in 2014.

¶ 21    For tax year 2015, Butalla prepared a report using the cost approach, income approach and sales comparison approach. Under the cost approach, Butalla found the value of the subject property was $4,750,000. Under the income approach, he determined the property had a market value of $4,839,768. Under the sales comparison approach, Butalla valued the subject property at $27,500 per bed for an overall value of $5,575,000. He concluded that the market value of the subject property in 2015 was $5,000,000.

¶ 22    Following the hearing, PTAB issued two 27-page decisions, one for each tax year. In both decisions, PTAB stated:

> "On this record there was a dispute between the parties concerning both building size and lot size which was not resolved in the course of [the] hearing. The Property Tax Appeal Board finds that based upon the evidence of record, these two disputes do not prevent a determination of the correct assessment of the subject property for the year(s) at issue."

PTAB ultimately determined that Will County's assessments of The Parc were too high, agreeing with VanSanten's determination that the market value of the property was "$2,000,000, or $9,852 per bed" in 2014. Thus, PTAB reduced the assessed value of the subject property to $666,660 for

2014, the amount requested by The Parc. For tax year 2015, PTAB reduced the assessed value of the building to $470,427, for a total assessed value of $665,000 for the entire property.

¶ 23    In its decision, PTAB stated:

"[T]he documentary evidence presented by the board of review fails to overcome the detailed appraisal report and accompanying testimony presented by the appellant through VanSanten, an appraiser with many years of experience in both the appraisal field and specifically in the appraisal of nursing home properties. The data and documentation presented on behalf of the board of review through Butalla failed to overcome the appellant's evidence and failed to support the current assessment of the subject property.

Based upon the preponderance of the most credible market value evidence contained in this record, the Board finds the best evidence of market value to be the appraisal submitted by the appellant. The Board finds the appraisal submitted by the appellant considered the unique factors associated with the subject property in arriving at the opinion of value ***. The Property Tax Appeal Board has given little weight to the arguments and evidence by the Will County Board of Review which failed to address these unique characteristics of the subject property and were not presented by a licensed Illinois appraiser. The subject's assessment reflects a market value *** which is above the best evidence of market value in the record as contained in the appellant's appraisal report."

District 204 appealed PTAB's decision to this court.

¶ 24                                    ANALYSIS

¶ 25    Final decisions of PTAB are subject to review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). 35 ILCS 200/16-195 (West 2018). In cases where, as here, a change in assessed value of $300,000 or more is sought by PTAB, review lies directly in the appellate court. *Id.* The scope of our review "extend[s] to all questions of law and fact." 735 ILCS 5/3-110 (West 2018). We review PTAB's conclusions of law *de novo* and its resolution of mixed questions of law and fact for clear error. *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010). PTAB's "findings and conclusions on questions of fact," however, are deemed "*prima facie* true and correct" (735 ILCS 5/3-110 (West 2018)) and "will be reversed only if they are against the manifest weight of the evidence, meaning that an opposite conclusion is clearly evident from the record." *Central Nursing Realty, LLC v. Illinois Property Tax Appeal Board*, 2020 IL App (1st) 180994, ¶ 32.

¶ 26    "When faced with challenges to a PTAB decision reducing a taxpayer's assessment, courts have noted that 'we are not charged with the responsibility of determining the market value of the subject property. Rather, the central question before us is whether the PTAB's decision to reduce petitioner's tax assessments * * * was correct.' " *Kankakee County Board of Review v. Property Tax Appeal Board*, 2012 IL App (3d) 110045, ¶ 12 (quoting *Kankakee County Board of Review v. Property Tax Appeal Board,* 226 Ill.2d 36, 50 (2007); *Cook County Board of Review v. Property Tax Appeal Board,* 384 Ill. App.3d 472, 479 (2008)). If any evidence supports PTAB's findings, its decision must be sustained on review. *Du Page County Board of Review v. Property Tax Appeal Board*, 284 Ill. App. 3d 649, 655 (1996); see *Kankakee County Board of Review*, 2012 IL App (3d) 110045, ¶¶ 18-19.

¶ 27    In Illinois, property is to be assessed at 33 1/3% of its "fair cash value." 35 ILCS 200/9-145 (West 2018). The term "fair cash value" is defined as what a willing buyer will pay a willing

seller. 35 ILCS 200/1-50 (West 2018). "Fair cash value is synonymous with fair market value and, as such, an arm's-length sales transaction is the best evidence thereof." *Walsh v. Property Tax Appeal Board,* 181 Ill. 2d 228, 230 (1998). When market value is the basis of an appeal to PTAB, the value of the property must be proved by a preponderance of the evidence. *Winnebago County Board of Review v. Property Tax Appeal Board*, 313 Ill. App. 3d 179, 183 (2000).

¶ 28        There are three basic methods of evaluating the fair market value of real property: (1) the sales comparison approach; (2) the income approach; and (3) the reproduction cost approach. *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43. Generally, "[n]one of these methods * * * provides conclusive evidence of value but are only factors to be considered." *Residential Real Estate Co. v. Property Tax Appeal Board,* 188 Ill. App. 3d 232, 243 (1989). "Professional appraisals generally employ more than one method to determine valuation; the use of more than one method in a single appraisal serves as a check on the value reached by the other method or methods." *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480 (2008). In theory, the different valuation approaches should lead to the same value. *Id*. "As this may not be the case in practice, one of the duties of the professional appraiser is to weigh any disparate results in order to reach a determination that best reflects the total true value of the property." *Chrysler Corp. v. State Property Tax Appeal Board,* 69 Ill. App. 3d 207, 211 (1979).

¶ 29        The sales comparison approach relies on sales of comparable properties in the open market to reach a determination of the subject property's fair cash value. *Kraft Foods, Inc.*, 2013 IL App (2d) 121031, ¶ 43. The income method is based on the property's income-producing potential and divides the property's net income by a capitalization rate, which is a return on and of capital, as determined by market data. *Id.* The reproduction cost approach "focuses on what it would cost to

10

recreate the property with the same value." *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563, 566 (2004). The reproduction cost approach "should be emphasized only in the context of some special-purpose property, which is defined as property of such a nature and applied to such a special use that it cannot have a market value." *Kraft Foods,* 2013 IL App (2d) 121031, ¶ 43.

¶ 30        It is appropriate to use all three appraisal methods in valuing properties, including nursing homes. See *Central Nursing Realty, LLC*, 2020 IL App (1st) 180994, ¶¶ 8-12, 15-17. The value of a nursing home is typically determined on a per bed basis. See *Regent Care Center, Inc. v. Hackensack City*, 362 N.J. Super. 403, 419, 828 A.2d 332, 342 (2003); *West Bay Manor Co. v. Cuyahoga County Board of Revision*, 73 Ohio St. 3d 568, 570, 653 N.E.2d 379, 380 (1995); *In re Luzerne County Assessment & Valuation for the Year 1986 of Property Owned by Davis*, 114 Pa. Cmwlth. 537, 540-42, 539 A.2d 61, 63-64 (1988); see also *Newport Center v. Jersey City*, 17 N.J. Tax 405, 421 (1998) (while office buildings are valued based on square footage and anticipated rent per square foot, nursing homes are valued "not in terms of rentable square feet but in terms of the number of beds").

¶ 31        PTAB's finding of "a property's fair market value will not be reversed unless it is against the manifest weight of the evidence, which occurs only where 'all reasonable and unbiased persons would agree that the decision is erroneous and that an opposite conclusion is clearly evident.' " *Kraft Foods, Inc.*, 2013 IL App (2d) 121031, ¶ 51 (quoting *Kankakee County Board of Review v. Illinois Property Tax Appeal Board,* 337 Ill. App. 3d 1070, 1074 (2003)). Weighing evidence and determining the credibility of witnesses are jobs of PTAB and are uniquely in its province. *Id*. On administrative review, this court does not reweigh the evidence, reassess the credibility of the witnesses, substitute its judgment for that of PTAB, or make an independent determination of the facts. *Id.* This court will not disturb PTAB's findings where there exists simply a difference of

opinion regarding the value of property. *Id.*; *County of Du Page v. Property Tax Appeal Board,* 303 Ill. App. 3d 538, 541 (1999).

¶ 32    Here, PTAB heard testimony from two witnesses about the value of The Parc's property. The Parc's witness, VanSanten, is a certified real estate appraiser who authored thousands of appraisals, including hundreds of nursing home appraisals. Applying all three appraisal methodologies, he determined that the value of the entire property was $2,000,000, less than half the value asserted by the Board of Review and its witness, Butalla, who is not a certified appraiser and had never before appraised a nursing home. PTAB weighed the testimony and evidence presented and concluded that "the best evidence of market value to be the appraisal submitted by [The Parc]." PTAB explained that "the documentary evidence presented by the board of review fail[ed] to overcome the detailed appraisal report and accompanying testimony presented by the appellant through VanSanten, an appraiser with many years of experience in both the appraisal field and specifically in the appraisal of nursing home properties."

¶ 33    It was the role of PTAB to resolve the conflicting evidence regarding the value of the property. See *Kraft Foods, Inc.*, 2013 IL App (2d) 121031, ¶ 51. Because PTAB had valid reasons for relying on the valuation evidence provided by The Parc, rather than the Board of Review, PTAB's decisions were not against the manifest weight of the evidence.

¶ 34    District 204, however, argues that PTAB's decisions were against the manifest weight of the evidence solely because PTAB did not determine the square footage of The Parc's nursing home building or the acreage of its lot. We disagree.

¶ 35    Here, it was not necessary for PTAB to determine the precise sizes of The Parc's building or lot because the evidence showed that regardless of the square footage of the building and acreage of the lot, the Board of Review overvalued The Parc's property. As explained above, both parties'

valuation witnesses assessed the subject property using the sales comparison approach, the income approach, and the reproduction cost approach. Under the first two approaches, the witnesses determined the value of the property based on the number of beds in the facility, not square footage. Unlike other buildings that are valued based on a price per square foot, it is appropriate to value a nursing home based on a price per bed because beds are "the basic units of income generation" in a nursing home. *Newport Center*, 17 N.J. Tax at 421. Thus, the square footage of the property was irrelevant for valuing the subject property under two of the three valuation methods employed by the witnesses.

¶ 36    Under the third valuation method, the reproduction cost approach, the witnesses determined the value of the facility at the time of the assessment based on the cost to rebuild a facility identical to The Parc and then factored in depreciation. VanSanten found the cost to rebuild a brand new 61,095 square-foot facility just like The Parc would be $10,856,175, slightly more than the $10,239,474 Butalla determined it would cost to build a 63,894 square foot facility identical to The Parc. However, VanSanten determined the ultimate value of the property, after applying an 85% depreciation rate, was $2,000,000, while Butalla applied a 50% depreciation rate to determine the ultimate value of the property was $3,808,212 under this approach. Thus, it was the depreciation rates used by the experts, rather than the size of the facility, that caused the witnesses to come to different valuation opinions under the reproduction cost approach. PTAB determined that the depreciation rate used by VanSanten was more appropriate because it was supported by the Marshall Valuation Service cost manual, while Butalla's depreciation rate was based solely on his opinion.

¶ 37    Finally, any dispute as to the property's lot size was irrelevant because while The Parc appealed the Board of Review's valuation of its building, it did not appeal the Board of Review's

valuations of its land. VanSanten testified that the value of The Parc's land was consistent with the county's 2014 and 2015 assessments of the property's land. Because The Parc did not dispute the value of its land, PTAB properly ruled that it was unnecessary to determine the exact acreage of The Parc's lot.

¶ 38    The evidence in this case established that no matter the square footage of the facility or acreage of the lot, the Board of Review's valuations of the property were too high and should be reduced. PTAB's decisions, which were supported by testimony and evidence from an experienced licensed appraiser, were not against the manifest weight of the evidence.

¶ 39                                                        CONCLUSION

¶ 40    For the foregoing reasons, we affirm the decisions of the Illinois Property Tax Appeal Board.

¶ 41    Affirmed.