Rule 23 order filed
May 24, 2022.
Motion to publish granted
June 17, 2022.

2022 IL App (5th) 190266

NO. 5-19-0266

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| SHAWNEE COMMUNITY UNIT SCHOOL DISTRICT NO. 84 and JACKSON COUNTY BOARD OF REVIEW, | ) ) ) | Appeal from the Illinois Property Tax Appeal Board. |
| | ) | |
| Petitioners-Appellants, | ) | |
| | ) | |
| v. | ) | Nos. 14-03445.001-I-3 through |
| | ) | 14-03445.009-I-3 and |
| ILLINOIS PROPERTY TAX APPEAL BOARD | ) | 15-00452.001-I-3 through |
| and GRAND TOWER ENERGY CENTER, | ) | 15-00452.010-I-3 |
| LLC, | ) | |
| | ) | Administrative Law Judge, |
| Respondents-Appellees. | ) | Edwin E. Boggess. |

JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Justices Wharton and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent, Grand Tower Energy Center, LLC (Grand Tower LLC), appealed the Jackson

County Board of Review's (Board's) 2014 and 2015 property tax assessments of Grand Tower

LLC's power generation facility, the Grand Tower Power Plant (subject property), to the Illinois

Property Tax Appeal Board (PTAB) pursuant to section 16-160 of the Property Tax Code (Code)

(35 ILCS 200/16-160 (West 2018)). Shawnee Community Unit School District No. 84 (School

District) intervened in the PTAB proceedings and moved to dismiss the appeals. The PTAB denied

the School District's motion to dismiss, and the matter proceeded to an evidentiary hearing.

1

Following the hearing, the PTAB issued a decision reducing the 2014 and 2015 tax assessments for the subject property from $31,538,245 to $3.3 million.

¶ 2       The School District filed this direct appeal pursuant to section 16-195 of the Code (*id.* § 16-195).[1] The Board subsequently joined in the appeal. On appeal, the School District and Board (petitioners) argue that the PTAB erred by denying the School District's motion to dismiss and by reducing the 2014 and 2015 property tax assessments for the subject property. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4       The subject property is a power generation facility that sits on 336.32 acres of land near the western bank of the Mississippi River in Jackson County, Illinois. The subject property was converted from a coal-fired power plant into a combined cycle gas turbine (CCGT) power plant in the 1950s, with additional reconfigurations occurring in 2001. The subject property's CCGT system consists of, *inter alia*, the following: two combustion turbines (CTs) that convert natural gas to electrical energy, two steam turbines (from the existing coal facility) that convert steam from the boiler to electrical energy, and heat recovery steam generators (HRSGs) that convert the heat expelled from the CTs into steam to power the steam turbines. The subject property also includes additional mechanical and electrical equipment, transformers, substations, instrumentation and controls, buildings, platforms, structures, foundations, piping, and fire protection. The subject property competes in the Midcontinent Independent System Operator (MISO) Illinois market.

---

[1]Section 16-195 of the Code provides that "in every case where a change in assessed valuation of $300,000 or more was sought, that review shall be afforded directly in the Appellate Court for the district in which the property involved in the Board's decision is situated, and not in the circuit court." 35 ILCS 200/16-195 (West 2018).

¶ 5    Prior to 2013, Ameren Corporation (Ameren), a public utility company, owned the subject property. For tax year 2013, the Board's final assessed value for all affected parcels of the subject property was $33,445,837.[2] The final assessed value was based on a stipulation between Ameren and the School District.

¶ 6    In January 2014, Rockland Capital (through its affiliated company, Main Line Generation, LLC) purchased the subject property from Ameren, along with two other power plant properties located in Elgin and Gibson City, Illinois, for a total of $168 million (portfolio sale). Thereafter, the rights and obligations relating to the subject property transferred to Grand Tower LLC under an assignment and assumption agreement.

¶ 7    For tax years 2014 and 2015, the Board's final assessed value for all affected parcels of the subject property was $31,538,245.[3] The final assessed value was based on a retrospective appraisal submitted by the School District for tax year 2014, which estimated that the subject property's fair market value was $94,994,714 for tax year 2014 and $95,339,314 for tax year 2015.

¶ 8    Grand Tower LLC filed two separate petitions for appeal with the PTAB, challenging the Board's assessments for the 2014 tax year (docket Nos. 14-03445.001-I-3 through 14-03445.009-I-3) and the 2015 tax year (docket Nos. 15-00452.001-I-3 through 15-00452.010-I-3). The PTAB ultimately consolidated the appeals for purposes of a hearing and final decision.

¶ 9    Grand Tower LLC's petitions listed a recent appraisal as the basis for the appeals. In support, Grand Tower LLC submitted an appraisal report prepared by Kevin S. Reilly, a certified

---

[2]The record reflects that the subject property is comprised of multiple parcels with differing assessment values. In the interest of brevity, we reference only the total assessment value of the subject property without listing the values for each separate parcel.

[3]We note that various documents contained in the record on appeal, including PTAB's final decision, refer to differing assessment values of the subject property for the 2014 and 2015 tax years. In its decision, PTAB initially notes that the parties stipulated the "final assessed value for both the 2014 and 2015 assessments of the subject property was $31,538,245 for all parcels affected herein" but later indicates that the 2014 assessment totaled $31,538,475 and the 2015 assessment totaled $31,538,878.

3

appraiser at evcValuation. In his appraisal report, Reilly estimated that the total fair market value of the subject property was $20 million. Reilly's appraisal report provided a detailed review of the methods Reilly employed in estimating the total fair market value of the subject property, with an effective date of January 1, 2014. Grand Tower LLC, relying on the estimated values in Reilly's appraisal report, requested that the PTAB set the 2014 assessment at $3,731,333 based on a "land assessment of $796,000 (1/3 of $2,388,000 FMV)" and a "building/equipment assessment of $2,932,398 (50% of $17,612,000 FMV) at $33^{1/3}$%."

¶ 10    The School District filed a request to intervene in the appeals, which the PTAB granted. The PTAB also granted the School District an extension to either submit evidence or request an additional extension of time. Shortly thereafter, the Board submitted a response to Grand Tower LLC's appeals.

¶ 11    The School District, prior to submitting any evidence, filed a motion to dismiss Grand Tower LLC's appeals based on Grand Tower LLC's failure to pay the 2014 property taxes for the subject property. The School District alleged that Grand Tower LLC failed to pay the taxes by the fall of 2015 "as required by 35 ILCS 200/23-5" and, instead, chose "to completely default on payment" of the taxes, resulting in the Jackson County circuit court entering a delinquency judgment and ordering a tax sale. The School District alleged that the Jackson County treasurer sold the taxes associated with the subject property to "SI Resources, LLC and Gupta Vinod" in accordance with the court's order. The School District further alleged that, as of the filing date of the motion, Grand Tower LLC failed to pay any taxes owed on the subject property. According to the School District, Grand Tower LLC was required to pay the taxes under protest before filing a statutory objection with either the PTAB or the court. Thus, the School District argued that the PTAB should dismiss Grand Tower LLC's appeals.

4

¶ 12    Grand Tower LLC filed a reply to the School District's motion to dismiss, arguing that a taxpayer must pay all outstanding taxes before filing a tax objection complaint in the circuit court but not before filing an appeal with the PTAB. In addition, Grand Tower LLC argued that the School District's motion mischaracterized the court's order and ruling. According to Grand Tower LLC, the court did not set the value of the subject property but merely found that the taxes on the subject property were delinquent and eligible for sale. Grand Tower LLC claimed the court determined only that the county treasurer's accounting of taxes was sufficient to grant a tax sale.

¶ 13    After considering the parties' arguments, the PTAB issued a written decision denying the School District's motion to dismiss. The PTAB rejected the School District's argument that the payment of all outstanding property taxes was a prerequisite to filing an appeal with the PTAB, finding that there was no provision requiring the payment of taxes in section 16-160 of the Code (35 ILCS 200/16-160 (West 2016)). The PTAB also rejected the School District's argument that the circuit court had jurisdiction over the assessment, agreeing with Grand Tower LLC's argument that the court proceedings did not address the assessment value of the subject property.

¶ 14    The School District filed a motion to reconsider the denial of its motion to dismiss, citing the Illinois Supreme Court's decision in *Madison Two Associates v. Pappas*, 227 Ill. 2d 474 (2008), in support of its argument that Grand Tower LLC was required to pay the taxes in order to pursue an appeal with the PTAB. The PTAB subsequently issued a written decision reaffirming its decision denying the School District's motion to dismiss after addressing *Madison Two Associates*, 227 Ill. 2d 474.

¶ 15    The School District then submitted two appraisal reports prepared by George K. Lagassa, a certified appraiser at Mainstream Associates, for tax years 2014 and 2015 as evidence of the subject property's fair market value. In his 2014 appraisal report, Lagassa estimated that the total

fair market value of the subject property was $220 million and concluded that the final value for the taxable portion of the subject property was $101,112,000 for tax year 2014. In his 2015 appraisal report, Lagassa estimated that the total fair market value of the subject property was $200 million and concluded that the final value for the taxable portion of the subject property was $91,963,000 for tax year 2015.

¶ 16 The School District also submitted a review report prepared by J. Fernando Sosa, an accredited senior appraiser, and Andrew Lines, a member of the appraisal institute, as evidence rebutting Reilly's 2014 appraisal. In the review report, Sosa and Lines concluded that Reilly's appraisal conclusions were not representative of the fair cash value of the subject property as a plant in operation and generating an income. The School District argued in its supporting brief that the PTAB should reject Reilly's estimated value and deny Grand Tower LLC's request for an assessment reduction.

¶ 17 In response, Grand Tower LLC submitted a review report prepared by Michael A. Green, a certified appraiser, as evidence rebutting Lagassa's appraisals. In his review report, Green concluded that Lagassa's appraisal conclusions were not representative of the fair market value of the subject property.

¶ 18 After receiving the evidence submitted by both parties, the PTAB issued notice that the matter was set for hearing before Administrative Law Judge (ALJ) Edwin Boggess on May 21, 2018. The parties then exchanged witness lists. Grand Tower LLC's witness list indicated that Grand Tower LLC intended to call, *inter alia*, the following witnesses at the hearing: Reilly, who would testify regarding his appraisal of the subject property; Green, who would testify regarding his review of Lagassa's appraisal of the subject property; Jonathon Beach, a Rockland Capital principal, who would testify regarding the acquisition of the subject property, the valuation of the

6

subject property, and other related issues; and Robert Rapenske, Rockland Capital's vice president of asset management, who would testify regarding environmental issues at the subject property and other related issues. The School District's amended witness list indicated that it intended to call, *inter alia*, the following witnesses: Sosa, who would testify regarding his review of Reilly's appraisal of the subject property; Lagassa, who would testify regarding his appraisal of the subject property; and David Wells, a former employee at the subject property, who would testify regarding the operation and condition of the subject property before and after the acquisition. The School District also listed Beach and Rapenske as potential witnesses, alleging that it was "requesting and expecting them to testify concerning all aspects of the acquisition and the plant's operations, including its performance prior to and after the time that [Grand Tower LLC] purchased the Subject Property."

¶ 19    Shortly before the scheduled hearing, the ALJ held a status conference with the parties via telephone. During the status conference, the parties agreed on the following stipulations: the Board's final assessed value for both the 2014 and 2015 tax years totaled $31,538,245, based on an appraisal submitted by the School District; the Board's final assessed value for the 2013 tax year totaled $33,445,837, based on a stipulation between Ameren and the School District; the parties' retained appraisers, Reilly, Lagassa, Green, and Sosa, were experts in the valuation of the subject property; 50% of the improvements at the subject property would be considered real property for purposes of taxation under the Code and 50% would be considered personal property not subject to taxation under the Code; and the total assessment value for the improvements would be calculated by multiplying the total cash value of all improvements by 50% and then multiplying that value by 33.33%. The parties also agreed to the subject property's land assessed values for the 2014 and 2015 tax years.

¶ 20    A three-day hearing commenced on May 21, 2018. The evidence adduced at the hearing was described in detail in the 83-page decision issued by the PTAB on June 18, 2019. In the interest of brevity, we provide only a general summary of the evidence that pertains to the issues raised on appeal.

¶ 21    The evidence generally established that power plant facilities ordinarily fall into one of three categories: base-load plants, which have long start-up times and operate most, if not all, of the time; intermediate, or mid-merit, plants, which have shorter start-up times and operate approximately half of the time; and peaking, or "peaker," plants, which have the shortest start-up times and only operate when there is a high demand for power. The design of the plant at the subject property was unique, in that it combined the older steam turbines from the existing coal facility with newer combustion turbines from subsequent reconfigurations. Additionally, the equipment at the subject property developed various issues over the years due to poor maintenance. Due to the unique design and poor maintenance practices, the plant at the subject property possessed characteristics of all three categories of power plants.

¶ 22    Beach, a principal at Rockland Capital, testified regarding Rockland Capital's acquisition of the subject property. Beach explained that Rockland Capital purchased a portfolio of three power plants, including the subject property, from Ameren for $168 million in a competitive two-step auction process, as is typical in the industry. According to Beach, Rockland Capital was required to raise its initial bid by $25 million to win auction of the portfolio. Beach explained that he, along with other members of the investment team, performed a discounted cash flow analysis to value the three power plants and advise Rockland Capital on an appropriate bid.

¶ 23    When Beach was asked how the projected discount cash flow analysis compared with the "actuals for 2014 and 2015," the School District's attorney objected on the grounds that such

testimony was irrelevant and contrary to the PTAB rule "prohibiting testimony about an appraisal" not submitted as evidence. The ALJ overruled the objection, stating that the testimony was "on the acquisition of the property and what they considered and what they used and how they came about to determine the price, whether it be allocated or total price for the portfolio." Beach then testified that the subject property "did significantly worse in 2014 and 2015 than the projections" from the discounted cash flow analysis.

¶ 24     Beach testified that Rockland Capital and Ameren gave the subject property an allocated value in the portfolio sale. When Beach testified that Ameren had three appraisals done on the subject property prior to the sale, the School District's attorney, again, objected based on the PTAB rule prohibiting testimony regarding appraisals not submitted into evidence. The ALJ, again, overruled the objection, and Beach testified that the allocated value assigned to the subject property totaled $47 million based on the highest estimated value of the three appraisals without formal negotiation.

¶ 25     Beach testified that, following the change of ownership, the subject property underwent necessary maintenance with a goal of reducing start-up times and selling more capacity. Beach claimed that Rockland Capital attempted to operate the plant year-round, explaining that the plant was only operated by Ameren during the summer months. Beach claimed that the subject property was not profitable in 2014 or 2015, despite Rockland Capital's efforts to improve operations.

¶ 26     Rapenske, Rockland Capital's vice president of asset management, testified that Rockland Capital purchased the portfolio of three power plants in a competitive auction process, as is typical in the industry. Rapenske explained that the plant at the subject property operated as a peaking plant in the MISO market. Rapenske noted, however, that the plant at the subject property had longer start-up times than most peaking facilities due to its unique design. According to Rapenske,

9

the average start-up time for a peaking facility was 30 to 40 minutes, but the subject property had start-up times of nearly eight hours. As a result, the subject property was at risk of missing opportunities to provide power when needed in the market. Rapenske also testified in detail regarding various maintenance and environmental issues at the subject property, which reduced the plant's productivity. Rapenske claimed that Rockland Capital attempted to correct various maintenance issues at the plant, but improvements occurred slowly over time.

¶ 27    Wells, a former employee at the subject property, testified to the following details on behalf of the School District. Wells worked at the subject property for 39 years prior to his retirement in 2016. Wells became very familiar with the subject property during his employment and believed the plant was in good condition at the time of his retirement. He claimed start-up times at the plant improved after Rockland Capital corrected various issues and improved maintenance practices. Wells attributed failed start-ups at the subject property to Rockland Capital's managerial decisions, not equipment failure. Wells explained that Rockland Capital attempted to operate the subject property as a peaking plant, which was hard on the equipment. Wells believed that the subject property could operate as either a base-load plant or an intermediate plant. Wells did not believe that Rockland Capital knew what they were doing and claimed that their actions could have damaged the steam turbines. Wells acknowledged that MISO decided when the plant would run.

¶ 28    Appraisers Reilly and Lagassa also testified regarding their respective estimates as to the value of the subject property. Reilly acknowledged the effective date of his report was January 1, 2014, but Reilly claimed his valuation opinion would not have significantly differed as of January 1, 2015, based on his experience, the MISO market, and the conditions of the subject property. Lagassa prepared two separate reports for the 2014 and 2015 tax years, which indicated slight

differences in estimated values of the subject property. The reports prepared by both appraisers were admitted into evidence at the hearing.

¶ 29    Reilly's estimated value of the subject property was $20 million for the 2014 and 2015 tax years. Lagassa's estimated values of the subject property for the 2014 and 2015 tax years were $220 million and $200 million, respectively. Reilly valued the subject property as a peaking plant, and Lagassa valued the subject property as an intermediate plant. While Reilly and Lagassa relied on different information, variables, and elements in their respective appraisals, both appraisers used the three traditional approaches to value: the cost approach, the sales comparison approach, and the income approach. Neither appraiser placed weight on the portfolio sale in determining the value of the subject property.

¶ 30    Due to the unique design, Reilly concluded that the subject property resembled an intermediate or base-load facility but had the operating characteristics of a less profitable peaking facility. He concluded that the highest and best use of the subject property was its current use as a gas-fired peaking plant selling power in the MISO market. Reilly noted, however, that the subject property was a highly inefficient peaking plant due to its hybrid design. Consistent with his report, Reilly testified that he valued the subject property at $14 million under the cost approach, $35,210,000 under the sales comparison approach, and $20 million under the income approach. Reilly placed primary emphasis on the income approach to value the subject property, claiming that most participants rely on the income approach to value power plants.

¶ 31    Consistent with his 2014 report, Lagassa testified that he valued the subject property at $185,600,000 under the cost approach, a range of value from $186,390,000 to $271,890,000 under the sales comparison approach, and $231,220,000 under the income approach. Consistent with his 2015 report, Lagassa testified that he valued the subject property at $202,824,000 under the cost

11

approach and $198,821,000 under the income approach. Lagassa testified that he used different comparable sales for the 2015 year but reached a similar range of values under the sales comparison approach. Lagassa weighed each approach equally in placing a value on the subject property.

¶ 32   Both Reilly and Lagassa provided extensive testimony regarding the information they relied on in formulating their opinions. Both appraisers also provided extensive, detailed testimony explaining how they calculated the values for the subject property under each approach. Both appraisers were also subjected to extensive cross-examination, which highlighted various differences, inconsistencies, and irregularities in their respective opinions to value. In addition, Sosa and Green testified regarding various issues they discovered when reviewing the appraisal reports prepared by Reilly and Green.

¶ 33   On June 18, 2019, the PTAB issued a lengthy written decision reducing the assessment values of the subject property for the 2014 and 2015 tax years. In its decision, the PTAB found that Grand Tower LLC proved, by a preponderance of the evidence, the subject property was overvalued in each tax year. In so finding, the PTAB disregarded Lagassa's appraisal and relied on Reilly's appraisal, finding that the fair market value of the subject property totaled $20 million as of January 1, 2014, with no significant change in value as of January 1, 2015. The PTAB also considered the portfolio sale but indicated that it placed little weight on the sale, given that neither appraiser relied on the sale in determining the value of the subject property. The PTAB compared the price at which Rockland Capital purchased the portfolio to the appraisers' estimated values of the subject property. The PTAB also found that the portfolio sale was an "arm's length" transaction. Based on its consideration of the evidence, the PTAB reduced the assessment value of the subject property from $31,538,245 to $3,333,000 for the 2014 and 2015 tax years.

12

¶ 34    The School District filed a motion to reconsider, arguing that the PTAB erred by (1) declining to dismiss the appeals based on Grand Tower LLC's failure to pay the contested taxes, (2) basing its decision on the portfolio sale where Grand Tower LLC listed "Recent Appraisal" as the basis for the appeal in its petition, (3) permitting testimony regarding appraisals not submitted into evidence prior to the hearing, and (4) valuing the subject property using a discounted cash flow analysis that was based on Ameren's prior business decisions rather than the expected earnings. The PTAB subsequently denied the motion to reconsider.

¶ 35    The School District directly appealed the PTAB's decision to this court, listing Grand Tower LLC and the PTAB as respondents in the petition for review. Shortly thereafter, the Board joined in the School District's petition for review.

¶ 36                                    II. Analysis

¶ 37    On appeal, petitioners, the Board and School District, raise various arguments that challenge the PTAB's decision denying the School District's motion to dismiss and the PTAB's final decision reducing the assessment value of the subject property for the 2014 and 2015 tax years. Before we address petitioners' arguments pertaining to the PTAB's decisions, we find it useful to set forth the legal framework guiding our analysis.

¶ 38    The Code regulates the assessment and collection of taxes. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 295 (2010) (citing *In re Application of the County Treasurer*, 214 Ill. 2d 253, 262 (2005); 35 ILCS 200/1-1 *et seq*. (West 2008)). "Sections 16-95 and 16-120 together provide that the Board of Review may revise or correct an assessment as appears to be just on complaint by a taxpayer that 'any property is overassessed, underassessed, or exempt.' " *Id.* at 296 (quoting 35 ILCS 200/16-95 (West 2008), and citing 35 ILCS 200/16-120 (West 2008)). The Code provides a taxpayer with two options for challenging the Board's decision pertaining to

13

the assessment of his or her property: (1) file an appeal with the PTAB (see 35 ILCS 200/16-160; 86 Ill. Adm. Code 1910.60(a)) or (2) pay the taxes due on the property under protest (see 35 ILCS 200/23-5) and file a tax objection complaint in the circuit court (see *id.* § 23-10). See *Madison Two Associates*, 227 Ill. 2d at 477. These options are mutually exclusive when valuation is at issue. *Id.* In other words, "[i]f a taxpayer seeks review before the [PTAB], he or she is precluded from filing objections based upon valuation in the circuit court." *Id.* "In the same way, if a taxpayer files objections based upon valuation in the circuit court, the taxpayer cannot file a petition contesting the assessment of the subject property with the [PTAB]." *Id.* at 477-78 (citing 35 ILCS 200/16-160 (West 2002); 86 Ill. Adm. Code 1910.50(f), (g) (2007) (amended at 31 Ill. Reg. 16222 (eff. Nov. 26, 2007))).

¶ 39    Where, as here, a taxpayer elects the first option and files an appeal with the PTAB, section 16-160 of the Code requires that the taxpayer to file a petition for review with the PTAB within 30 days' written notice of the Board's decision. 35 ILCS 200/16-160 (West 2018). Section 16-185 requires that the PTAB "make a decision in each appeal or case appealed to it" based upon "equity and the weight of the evidence and not upon constructive fraud," which "shall be binding upon appellant and officials of government." *Id.* § 16-185. Final decisions of the PTAB are subject to the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)), and where, as here, a change in assessed value of $300,000 or more is sought, review lies directly in the appellate court. 35 ILCS 200/16-195 (West 2018).

¶ 40    The scope of this court's review "extend[s] to all questions of law and fact." 735 ILCS 5/3-110 (West 2018). This court reviews the PTAB's conclusions of law *de novo* and the PTAB's resolution of mixed questions of law and fact for clear error. *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010). However, the PTAB's "findings

and conclusions on questions of fact" are deemed "*prima facie* true and correct" (735 ILCS 5/3-110 (West 2018)) and "will be reversed only if they are against the manifest weight of the evidence, meaning that an opposite conclusion is clearly evident from the record." *Central Nursing Realty, LLC v. Illinois Property Tax Appeal Board*, 2020 IL App (1st) 180994, ¶ 32. We now turn to petitioners' arguments on appeal.

¶ 41                    A. Denial of Motion to Dismiss

¶ 42    Petitioners first challenge the PTAB's denial of the School District's motion to dismiss Grand Tower LLC's appeals. Petitioners argue that the PTAB erred as a matter of law when it declined to dismiss the appeals after Grand Tower LLC failed to pay the contested taxes and the circuit court ordered a tax sale. Specifically, petitioners argue that the appeals should have been dismissed, because (1) Grand Tower LLC failed to pay the contested taxes as required by the Code and (2) the PTAB lost jurisdiction over the appeals when the court ordered the tax sale.

¶ 43    Petitioners' arguments present issues of statutory construction and subject-matter jurisdiction, which are both matters that this court reviews *de novo*. *Millennium Park Joint Venture, LLC*, 241 Ill. 2d at 294 (citing *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006); *Blount v. Stroud*, 232 Ill. 2d 302, 308 (2009)). We note, however, that "[a]s an administrative agency, PTAB has the authority to construe statutory provisions in making decisions and determinations." *Spiel v. Property Tax Appeal Board*, 309 Ill. App. 3d 373, 377 (1999) (citing *Geneva Community Unit School District No. 304 v. Property Tax Appeal Board*, 296 Ill. App. 3d 630, 633 (1998)). "This court gives substantial weight and deference to statutory interpretations made by an administrative agency charged with the administration of a particular statute." *Id.* (citing *Oregon Community Unit School District No. 220 v. Property Tax Appeal Board*, 285 Ill. App. 3d 170, 175 (1996)). Thus, "[w]hile we exercise an independent review of PTAB's conclusions of law, we may look to

15

PTAB's interpretation of its own enabling statute as an informed source for ascertaining legislative intent." *Id.* (citing *La Salle Partners, Inc. v. Property Tax Appeal Board*, 269 Ill. App. 3d 621, 628 (1995)). With this in mind, we consider petitioners' specific arguments.

¶ 44   1. Failure to Pay the Contested Taxes

¶ 45   Petitioners first argue that the PTAB erred as a matter of law when it found there was no requirement that a taxpayer pay the contested taxes to pursue an appeal under section 16-160 of the Code. We disagree.

¶ 46   As noted, the Code provides a taxpayer with two options for challenging the Board's decision pertaining to the assessment of his or her property: (1) file an appeal with the PTAB (see 35 ILCS 200/16-160; 86 Ill. Adm. Code 1910.60(a)) or (2) pay the taxes due on the property under protest (see 35 ILCS 200/23-5) and file a tax objection complaint in the circuit court (see *id.* § 23-10). See *Madison Two Associates*, 227 Ill. 2d at 477. The procedural requirements for these options differ and are set forth in separate articles of the Code. See 35 ILCS 200/art. 16, art. 23 (West 2018).

¶ 47   We begin, as did the PTAB, by examining section 16-160, which sets forth the procedural requirements for filing appeals with the PTAB. Pursuant to section 16-160, a taxpayer, or interested taxing body, may appeal the Board's decision to the PTAB for review within 30 days' written notice of the decision. 35 ILCS 200/16-160 (West 2018). Section 16-160 also provides, in pertinent part, as follows:

"In any appeal where the [Board] has given written notice of the hearing to the taxpayer 30 days before the hearing, failure to appear at the [Board's] hearing shall be grounds for dismissal of the appeal unless a continuance is granted to the taxpayer. If an appeal is dismissed for failure to appear at a [Board's] hearing, the Property Tax Appeal Board shall

16

have no jurisdiction to hear any subsequent appeal on that taxpayer's complaint. Such taxpayer or taxing body, hereinafter called the appellant, shall file a petition with the clerk of the [PTAB], setting forth the facts upon which he or she bases the objection, together with a statement of the contentions of law which he or she desires to raise, and the relief requested. If a petition is filed by a taxpayer, the taxpayer is precluded from filing objections based upon valuation, as may otherwise be permitted by Sections 21-175 and 23-5. However, any taxpayer not satisfied with the decision of the board of review or board of appeals as such decision pertains to the assessment of his or her property need not appeal the decision to the [PTAB] before seeking relief in the courts." *Id*.

Section 16-185 additionally provides that "[t]he extension of taxes on any assessment so appealed shall not be delayed by any proceeding before the [PTAB], and, in case the assessment is altered by the [PTAB], any taxes extended upon the unauthorized assessment or part thereof shall be abated, or, if already paid, shall be refunded with interest as provided in Section 23-20." *Id*. § 16-185.

¶ 48    In view of these statutory provisions, we cannot say that the PTAB erred as a matter of law in finding there was no requirement that a taxpayer pay the contested taxes to pursue an appeal under section 16-160. Section 16-160 sets forth a 30-day filing deadline and clearly requires dismissal of an appeal if a taxpayer fails to appear at a hearing but does not require dismissal of an appeal for failure to pay the contested taxes. Moreover, our legislature included the phrase "if already paid" in section 16-185 when addressing the procedure to be followed in cases where an assessment is altered by the PTAB's decision.

¶ 49    Petitioners appear to acknowledge that section 16-160 does not include a provision that requires a taxpayer to pay the contested taxes and, thus, do not argue that the PTAB erred in its

17

interpretation of section 16-160. Petitioners, instead, argue that section 23-5 "requires any person objecting to his or her taxes to pay all of the taxes due within 60 days of the due date." Petitioners claim that section 23-5 "applies equally to tax objectors at the Circuit Court and tax objectors at the PTAB." We disagree.

¶ 50 As respondents correctly note, petitioners' argument is premised on a provision found in article 23, which governs the "Procedures and Adjudication for Tax Objections" in the circuit court. *Id*. art. 23. Section 23-5 provides, in pertinent part, as follows:

> "if any person desires to object to all or any part of a property tax for any year, for any reason other than that the property is exempt from taxation, he or she shall pay all of the tax due within 60 days from the first penalty date of the final installment of taxes for that year. Whenever taxes are paid in compliance with this Section and a tax objection complaint is filed in compliance with Section 23-10, 100% of the taxes shall be deemed paid under protest without the filing of a separate letter of protest with the county collector." *Id*. § 23-5.

Section 23-10 provides that "the person paying the taxes due as provided in Section 23-5 may file a tax objection complaint under Section 23-15 within 75 days after the first penalty date of the final installment of taxes for the year in question." *Id*. § 23-10. Section 23-20, the provision referenced in section 16-185, provides, in pertinent part, as follows:

> "No protest shall prevent or be a cause of delay in the distribution of tax collections to the taxing districts of any taxes collected which were not paid under protest. If the final order of the Property Tax Appeal Board or of a court results in a refund to the taxpayer, refunds shall be made by the collector from funds remaining in the Protest Fund until such funds

18

are exhausted and thereafter from the next funds collected after entry of the final order until full payment of the refund and interest thereon has been made." *Id*. § 23-20.

¶ 51   A plain reading of the statutory provisions cited above demonstrates that section 23-5 does not apply to appeals filed with the PTAB pursuant to section 16-160. See *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 16 ("The best indicator of the legislative intent is the language in the statute, which must be given its plain and ordinary meaning." (citing *Corbett v. County of Lake*, 2017 IL 121536, ¶ 30)). Petitioners highlight the legislature's use of the phrases "any person" and "for any year, for any reason" in section 23-5; however, "[s]tatutory terms cannot be considered in isolation but must be read in context to determine their meaning." *Id.* (citing *Corbett*, 2017 IL 121536, ¶¶ 27, 30). The final sentence of section 23-5, which petitioners omitted in their brief to this court, provides that "[w]henever taxes are paid in compliance with this Section *and a tax objection complaint is filed in compliance with Section 23-10*, 100% of the taxes shall be deemed paid under protest ***." (Emphasis added.) 35 ILCS 200/23-5. Additionally, section 16-160 precludes a taxpayer from filing an objection based on valuation under section 23-5 if the taxpayer has filed an appeal with the PTAB. *Id*. § 16-160. Thus, in our view, the plain statutory language indicates that the payment requirement set forth in section 23-5 only applies to tax objections filed in the circuit court.

¶ 52   Moreover, the legislature included the payment under protest requirement in article 23, which governs the "Procedures and Adjudication for Tax Objections" in the circuit court. 35 ILCS 200/art. 23. Section 16-160 prescribes a filing deadline and provides for dismissal of an appeal based on a taxpayer's failure to appear at a hearing before the Board but does not include a provision that requires dismissal of an appeal based on a taxpayer's failure to pay the contested tax. *Id*. § 16-160. As a result, we presume that the legislature had no intention of requiring the

19

PTAB to dismiss an appeal based on a taxpayer's failure to pay the contested taxes. See *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 24 ("When the legislature includes particular language in one section of a statute but omits it in another section of the same statute, courts presume that the legislature acted intentionally and purposely in the inclusion or exclusion [citations], and that the legislature intended different meanings and results [citations]."); see also *People v. Goossens*, 2015 IL 118347, ¶ 12 ("It is well settled that when the legislature uses certain language in one instance of a statute and different language in another part, we assume different meanings were intended.").

¶ 53    The legislature also prescribed differing procedural requirements and filing deadlines for PTAB appeals and tax objection complaints. Notably, a taxpayer must wait until "after the first penalty date of the final installment of taxes for the year in question" before filing a tax objection complaint in the circuit court, and then the taxpayer must pay "all of the tax due within 60 days from the first penalty date of the final installment of taxes for that year." (Internal quotation marks omitted.) *Millennium Park Joint Venture, LLC*, 241 Ill. 2d at 308 (quoting 35 ILCS 200/23-5, 23-10 (West 2008)). In contrast, a taxpayer may appeal the Board's decision to the PTAB immediately, likely before any taxes become due. See *id.*; 35 ILCS 200/16-160 (appeals from decisions of the Board must be filed with the PTAB within 30 days' notice). Accordingly, the application of section 23-5 would not make sense in the context of an appeal filed pursuant to section 16-160. See *Dynak*, 2020 IL 125062, ¶ 16 ("[I]n interpreting statutory language, we may consider the consequences that would result from construing the statute one way or the other."). Thus, we find it clear that the legislature did not intend for section 23-5 to apply to appeals filed pursuant to section 16-160. For these additional reasons, we conclude that section 23-5 does not apply to appeals filed pursuant to section 16-160.

¶ 54    Petitioners assert that a footnote in our supreme court's decision in *Madison Two Associates*, 227 Ill. 2d 474, supports a contrary conclusion. In *Madison Two Associates*, our supreme court addressed the procedural distinction between the two options in a footnote as follows:

> "Unlike the tax objection alternative, paying the property tax is not a prerequisite for seeking relief from the [PTAB]. Pursuing the appeal through the [PTAB] does not, however, stay the obligation to pay the contested tax. If the tax falls due before the [PTAB] issues its decision, the tax must still be paid. If the [PTAB] subsequently lowers the assessment, any taxes paid on the portion of the assessment determined to have been unauthorized must be refunded with interest." *Id.* at 477 n.2 (citing 35 ILCS 200/16-185 (West 2002)).

¶ 55    In our view, the footnote supports our conclusion that section 23-5 does not apply to appeals filed pursuant to section 16-160—specifically, where our supreme court clarified that, "[u]nlike the tax objection alternative, paying the property tax is not a prerequisite for seeking relief from the [PTAB]" (*id.* (citing 35 ILCS 200/16-185 (West 2002))). Despite this, petitioners claim that our supreme court relied on section 23-5 where it noted that the tax must still be paid if it falls due before the PTAB issues its decision. We note that our supreme court merely summarized section 16-185, which provides that an appeal to the PTAB does not stay the obligation to pay the contested taxes. See 35 ILCS 200/16-185 (West 2018). Accordingly, we do not find the footnote in *Madison Two Associates* supports petitioners' argument that section 23-5 "applies equally" to appeals filed with the PTAB and tax objection complaints filed in the circuit court.

21

¶ 56     Petitioners also assert that this narrow interpretation of section 23-5 runs contrary to well-established public policy in Illinois. Petitioners claim that it is a bedrock principle of Illinois law "that a taxpayer seeking relief from its property tax assessment must first pay the taxes due, and then seek relief in the form of a refund." According to petitioners, this requirement ensures "that taxpayers cannot withhold payment as a means of impeding the government's functions[,] including the education of children and the protection of citizens." Petitioners claim that if a taxpayer is permitted to pursue an appeal with the PTAB without paying the contested taxes, "large taxpayers throughout Illinois will be encouraged to hold local taxing bodies hostage, exerting undue influence to coerce settlements and reduced assessments." While we sympathize with petitioners, these arguments misconstrue the limited issue before this court—whether the PTAB erred when it applied section 16-160 and found there was no requirement that a taxpayer pay the contested taxes to pursue an appeal with the PTAB. Petitioners acknowledge that section 16-160 does not include such requirement. This court "cannot rewrite a statute under the guise of statutory construction or depart from the plain language of a statute by reading into it exceptions, limitations, or conditions not expressed by the legislature." *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004) (citing *In re Mary Ann P.*, 202 Ill. 2d 393, 409 (2002)). These concerns, instead, fall squarely within the purview of the legislature.

¶ 57     We also reiterate that an appeal to the PTAB does not stay the obligation to pay the contested taxes. As our supreme court noted in *Madison Two Associates*, "[i]f the tax falls due before the [PTAB] issues its decision, the tax must still be paid." 227 Ill. 2d at 477 n.2 (citing 35 ILCS 200/16-185 (West 2002)). Respondents agree that filing an appeal with the PTAB does not stay or alleviate a taxpayer's obligation to pay the contested taxes. As respondents correctly note, and as will be discussed in more detail below, Grand Tower LLC's failure to pay the contested

22

taxes resulted in a delinquency judgment and tax sale. Accordingly, the contested taxes were paid shortly after they became due, albeit by a third party. Thus, the legislature included a provision in the Code that provides an alternative means to prevent a taxpayer from withholding the payment of taxes to impede government function.

¶ 58   For the reasons stated, we hold that the PTAB correctly interpreted and applied section 16-160 by finding that the payment of the contested taxes was not a prerequisite to filing an appeal with the PTAB. Therefore, we conclude that the PTAB did not err as a matter of law when it declined to dismiss the appeals based on Grand Tower LLC's failure to pay the contested taxes.

¶ 59   2. Effect of Tax-Sale Proceedings

¶ 60   Petitioners next argue that the PTAB should have dismissed the appeals for lack of jurisdiction, because the circuit court acquired jurisdiction over all matters relating to the contested taxes after ordering the tax sale. We disagree.

¶ 61   Where, as here, a property's taxes become delinquent, the Code provides that "the county may apply for a judgment against and a sale of the property at a public auction (known as a tax sale) to recover the delinquent taxes." *In re Application for a Tax Deed*, 2018 IL App (5th) 170170, ¶ 9 (*As-Is Properties*) (citing 35 ILCS 200/21-110 (West 2016)); *A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 529 (1999); *A.P. Properties, Inc. v. Rattner*, 2011 IL App (2d) 110061, ¶ 13; *In re Application of the County Treasurer & ex officio County Collector*, 378 Ill. App. 3d 842, 846 (2007) (*Hawkeye*)). Section 21-175 of the Code (35 ILCS 200/21-175 (West 2018)), a provision referenced in section 16-160, allows the circuit court to entertain defenses to the county collector's application for judgment and tax sale when the defense includes a writing specifying the grounds for the objection. In addition, section 21-175 provides that a circuit court may only

23

entertain a defense to the entry of judgment when the contested taxes have been paid under protest as required by section 23-5 with a tax objection complaint filed under section 23-10. See *id.*

¶ 62 "Any person owning or claiming a property upon which application for judgment is applied for may pay the taxes and costs to the county collector at any time before the taxes are sold, thereby avoiding the sale." *As-Is Properties*, 2018 IL App (5th) 170170, ¶ 9 (citing 35 ILCS 200/21-165 (West 2016)). "If the property owner does not pay the taxes first, the county may sell the property to the highest bidder, who then becomes liable to the county for the amount bid." *Rattner*, 2011 IL App (2d) 110061, ¶ 13; see also 35 ILCS 200/21-190, 21-205, 21-240, 21-260 (West 2016); *Goshinsky*, 186 Ill. 2d at 529. The tax buyer receives a certificate of purchase after the circuit court confirms the sale. 35 ILCS 200/21-240, 21-260(c) (West 2016); *Goshinsky*, 186 Ill. 2d at 529; *Rattner*, 2011 IL App (2d) 110061, ¶ 13. However, "[t]he purchaser at the tax sale does not immediately gain title to the property; rather, there is a grace period where the property owner has the right to 'redeem' the property by paying to the county clerk the delinquent taxes, as well as costs, fees, and interest." *Hawkeye*, 378 Ill. App. 3d at 846; see also 35 ILCS 200/21-345(a) (West 2016) ("Property sold under this Code may be redeemed only by those persons having a right of redemption ***."); 35 ILCS 200/21-350 (West 2016) ("Property sold under this Code may be redeemed at any time before the expiration of 2 years from the date of sale," with certain exceptions); 35 ILCS 200/21-370 (West 2016) (provisions pertaining to redemption of forfeited property).

¶ 63 In the present case, Grand Tower LLC challenged the assessment values of the subject property by appealing the Board's decision to the PTAB pursuant to section 16-160 of the Code. Petitioners do not argue, and there is nothing in the record to show, that Grand Tower LLC failed to comply with the requirements of section 16-160 by filing its petition for review with the PTAB.

24

Accordingly, the PTAB acquired jurisdiction over the appeals after Grand Tower LLC filed its petition for review. The taxes on the subject property were not due at the time Grand Tower LLC filed the appeals with the PTAB, and Grand Tower LLC did not pay the contested taxes prior to filing the appeals. When the taxes became due on the subject property during the pendency of the appeals, Grand Tower LLC failed to pay the contested taxes and the taxes became delinquent.

¶ 64    While Grand Tower LLC's appeals remained pending before the PTAB, the county attempted to collect the delinquent taxes by applying for a judgment and tax sale as permitted by section 21-110 of the Code (35 ILCS 200/21-110 (West 2018)). Grand Tower LLC did not raise a defense to the county's application by filing a writing that specified the grounds for the objection as permitted by section 21-175, which would have also required Grand Tower LLC to pay the contested taxes under protest under section 23-5 and to file a tax objection complaint under section 23-10. See *id.* § 21-175. Thereafter, the circuit court entered a delinquency judgment and ordered a tax sale, finding the amount of taxes sufficient. In accordance with the court's order, the county treasurer subsequently sold the taxes associated with the subject property to SI Resources, LLC, and Gupta Vinod.

¶ 65    Petitioners argue that the PTAB lost jurisdiction of Grand Tower LLC's appeals after the circuit court entered the delinquency judgment and ordered the tax sale. In support, petitioners rely on *Vulcan Materials Co. v. Bee Construction*, 96 Ill. 2d 159 (1983). In *Vulcan Materials Co.*, our supreme court observed that "a tax-sale proceeding is *in rem* and the court acquires jurisdiction over the land when the county collector makes his application for judgment and order for sale." *Id.* at 165. Our supreme court further observed that, "[o]nce acquired, the court retains its jurisdiction to make all necessary findings and enter all necessary orders supplemental to the original tax sale." *Id*. We agree that, here, the circuit court acquired jurisdiction over the subject

25

property after the county filed an application for judgment and order for sale. We also agree that the court retained jurisdiction to issue all necessary orders to effectuate the sale and to require issuance of tax deeds. We disagree, however, that *Vulcan Materials Co.* supports petitioners' claim that the PTAB loses jurisdiction over a previously filed appeal when a county files an application for judgment and order for sale because that case did not involve concurrent PTAB proceedings.

¶ 66    While not cited by the parties, we find section 16-185 instructive on this issue. As noted, section 16-185 provides that "[t]he extension of taxes on any assessment so appealed shall not be delayed by any proceeding before the [PTAB]" and that "any taxes extended upon the unauthorized assessment or part thereof shall be abated, or, if already paid, shall be refunded with interest as provided in Section 23-20." 35 ILCS 200/16-185. Based on our reading of section 16-185, it appears the legislature contemplated simultaneous proceedings before the PTAB and the circuit court. Thus, we find that the PTAB did not lose jurisdiction over Grand Tower LLC's appeals when the county filed an application for judgment and order for sale.

¶ 67    Petitioners assert that the circuit court, in finding the taxes sufficient, "approved the assessment that was supplemental to the original tax" and "the PTAB could not overrule" the court by "finding that some other amount of taxes would have been sufficient." However, there is nothing in the record on appeal to support petitioners' assertion that the court "approved the assessment" by finding the taxes sufficient to order a tax sale. The record contains only the court's written order, which makes no reference to the assessment. The record does not contain a report or transcript of the proceedings before the court. Thus, we find the record insufficient to support petitioners' assertion that the court "approved the assessment" when it entered the delinquency judgment and ordered the tax sale.

26

¶ 68     We also note that the legislature, in its wisdom, included a provision in section 16-160 that prevents the PTAB and circuit court from both deciding an issue relating to the correctness of an assessment. Where, as here, a taxpayer challenges the Board's decision pertaining to an assessment by filing an appeal with the PTAB, section 16-160 expressly precludes the taxpayer from also filing a valuation objection in the circuit court as permitted by sections 23-5 and 21-175. Grand Tower LLC complied with section 16-160 and did not challenge the assessment by objecting to the assessment value in the circuit court. As a result, that issue was not before the circuit court during the tax-sale proceedings. Thus, the PTAB had jurisdiction to determine the correctness of the assessment, not the circuit court.

¶ 69     Accordingly, we hold that the tax-sale proceedings in the circuit court did not deprive the PTAB of subject-matter jurisdiction over Grand Tower LLC's appeals challenging the assessment values of the subject property. Therefore, we conclude that the PTAB did not err as a matter of law when it declined to dismiss the appeals for lack of jurisdiction.

¶ 70                              B. Reduction of Assessment Value

¶ 71     Petitioners next challenge the PTAB's final decision reducing the assessment value of the subject property. Petitioners argue that this court should reverse the PTAB's decision because the PTAB erred as a matter of law when it (1) based its decision on the portfolio sale, (2) allowed Grand Tower LLC to present testimony regarding appraisals that were not submitted into evidence prior to the hearing, and (3) valued the subject property based on the business decisions of Ameren rather than the subject property's income-producing capabilities. We consider these arguments in turn.

27

¶ 72     1. Portfolio Sale

¶ 73     Petitioners first argue that this court should reverse the PTAB's decision because the PTAB "went beyond its statutory authority and violated its own rules along with fundamental principles of judicial fairness" by permitting testimony regarding the portfolio sale at the hearing and by relying on the portfolio sale in its decision. We disagree.

¶ 74     As an initial matter, we find petitioners forfeited review of the argument that the PTAB erred by permitting testimony regarding the portfolio sale at the hearing. " 'It is axiomatic that if an argument or objection is not made in an administrative proceeding, it is [forfeited] and may not be raised for the first time on administrative review.' " *National City Bank of Michigan/Illinois v. Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1044 (2002) (quoting *La Salle Partners*, 269 Ill. App. 3d at 631). Here, as respondents correctly note, petitioners did not make a general objection to testimony regarding the portfolio sale at the hearing. Petitioners, instead, specifically objected to testimony regarding a discounted cash flow analysis and other appraisals that were performed prior to the portfolio sale. Petitioners also failed to raise the issue in the motion to reconsider the PTAB's decision. Thus, petitioners' argument in this regard is forfeited.

¶ 75     Forfeiture aside, we find no error in the PTAB's decision to permit testimony regarding the portfolio sale at the hearing. Petitioners assert that the School District was unfairly surprised by the testimony at the hearing because Grand Tower LLC failed to list the portfolio sale as a basis for the appeals in the petition, as required by section 16-160 of the Code and PTAB Rule 1910.30(h).

¶ 76     Petitioners cite a provision in section 16-160 of the Code, which requires a taxpayer to "file a petition with the clerk of the [PTAB], setting forth the facts upon which he or she bases the objection, together with a statement of the contentions of law which he or she desires to raise, and

28

the relief requested." 35 ILCS 200/16-160 (West 2018). Petitioners also cite PTAB Rule 1910.30(h), which provides that "[e]very petition for appeal shall state the facts upon which the contesting party bases an objection to the decision of the board of review, together with a statement of the contentions of law the contesting party desires to raise." 86 Ill. Adm. Code 1910.30(h) (2018).

¶ 77    We note, however, that "technical errors in the proceedings before the administrative agency are grounds for reversal only where the error materially affected the rights of the complaining party and resulted in substantial injustice." *La Salle Partners*, 269 Ill. App. 3d at 630 (citing 735 ILCS 5/3-111(b) (West Supp. 1993)). We also note that "[a]n administrative agency's decision regarding the conduct of its hearing and the admission of evidence is governed by an abuse of discretion standard and is subject to reversal only if there is demonstrable prejudice to the complaining party." *John J. Moroney & Co. v. Illinois Property Tax Appeal Board*, 2013 IL App (1st) 120493, ¶ 50 (citing *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003); *Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 541 (2010)).

¶ 78    Here, Grand Tower LLC's petition listed a recent appraisal as the basis for the appeal. Grand Tower later submitted Reilly's appraisal as evidence in support of its appeals. We acknowledge that Grand Tower LLC did not list a recent sale as the basis for the appeal and, thus, Grand Tower LLC did not provide details or documentation pertaining to the portfolio sale in accordance with the directions set forth in the petition. Petitioners claim they were unfairly surprised by the evidence pertaining to the portfolio sale at the hearing. However, we fail to see how petitioners suffered any substantial injustice or demonstrable prejudice as a result of Grand Tower LLC's omission.

¶ 79    Contrary to petitioners' assertion, the record demonstrates that petitioners were not unfairly surprised by the testimony regarding the portfolio sale. As respondents correctly note, the School District included a discussion of the portfolio sale in a brief filed with the PTAB well before the hearing. Specifically, the School District noted in the brief that the appraisers did not give weight to the portfolio sale, wherein Rockland Capital purchased the three power plants for $168 million. The School District further noted that the portfolio sale was not a reliable comparable sale because it was a complicated, rushed transaction with too many unknowns. Moreover, Grand Tower LLC identified Beach as a potential witness prior to the hearing and indicated that he would "testify regarding the acquisition of the subject property, the valuation of the subject property, and issues related thereto." The School District's amended witness list indicated that Grand Tower LLC identified Beach, among others, as a witness, and that the School District was "requesting and expecting them to testify concerning all aspects of the acquisition" and regarding the subject property's performance following the acquisition. Thus, we fail to see how petitioners were unfairly surprised by testimony pertaining to the portfolio sale at the hearing.

¶ 80    Moreover, contrary to petitioners' assertion, the PTAB's decision to reduce the assessment value of the subject property was not based on its consideration of the portfolio sale. While the PTAB compared the appraisal values to the portfolio sale in its decision, the PTAB clearly indicated that it relied on Reilly's appraisal in determining the value of the subject property and that it placed little weight on the portfolio sale. In other words, the PTAB clearly indicated that it based its decision on Reilly's appraisal—the recent appraisal Grand Tower LLC submitted in support of its petition. Thus, we conclude that Grand Tower LLC's failure to list the portfolio sale as a basis for the appeal in the petition did not result in reversible error.

¶ 81    Petitioners also argue that the PTAB erred as a matter of law when it determined the portfolio sale was an arm's-length transaction. "The Illinois Supreme Court has held that a contemporaneous sale of the subject property between parties dealing at arm's length is relevant to the question of fair market value." *Bloomington Public Schools, District No. 87 v. Illinois Property Tax Appeal Board*, 379 Ill. App. 3d 387, 392 (2008) (citing *People ex rel. Korzen v. Belt Ry. Co. of Chicago*, 37 Ill. 2d 158, 161 (1967)). " 'However, the sale price of property does not necessarily establish its value without further information on the relationship of the buyer and seller and other circumstances.' " *Id.* (quoting *Residential Real Estate Co. v. Illinois Property Tax Appeal Board*, 188 Ill. App. 3d 232, 242 (1989)).

¶ 82    We initially note that a determination of whether a sale was "at arm's length" presents a question of fact, and a reviewing court considers the PTAB's determination on the issue as *prima facie* true and correct. *Id.* In other words, if the record contains evidence to support the PTAB's factual finding, the finding will not be disturbed on review. *Id*.

¶ 83    Here, Beach and Rapenske testified that Rockland Capital purchased the portfolio from Ameren in a competitive auction process, as is typical in the industry. Beach also testified that Rockland Capital was required to raise its bid to win auction of the portfolio. Both parties presented testimony and evidence regarding the time frame and circumstances surrounding the portfolio sale. Because conflicting evidence was presented on the issue, we cannot say the PTAB's determination that the portfolio sale was an arm's-length transaction was against the manifest weight of the evidence.

¶ 84    Even if we concluded that the PTAB's determination was against the manifest weight of the evidence, we would not reverse the PTAB's decision. The PTAB acknowledged that the appraisers gave little weight to the portfolio sales in valuing the subject property. As a result, the

31

PTAB placed little weight on the portfolio sale in reaching its decision. The PTAB, instead, relied on Reilly's appraisal and merely compared the portfolio sale to the appraisal values. For this additional reason, we reject petitioners' argument that the PTAB's reliance on the portfolio sale constitutes reversible error.

¶ 85    2. Appraisal Testimony

¶ 86    Petitioners next argue that this court should reverse the PTAB's decision because the PTAB improperly permitted appraisal testimony over the School District's objection at the hearing. Specifically, petitioners assert that the PTAB erred by allowing Beach's testimony regarding the discounted cash flow analysis performed by Rockland Capital prior to the portfolio sale, as well as Beach's testimony regarding the appraisals Ameren conducted prior to the sale. We disagree.

¶ 87    Petitioners assert that, by permitting Beach to testify regarding appraisals not submitted into evidence prior to the hearing, the PTAB denied the School District a fair hearing and violated PTAB Rules 1910.67(l), 1910.92(a), and 1910.50(c). PTAB Rule 1910.67(l) provides as follows:

> "Appraisal testimony offered to prove the valuation asserted by any party shall not be accepted at the hearing unless a documented appraisal has been timely submitted by that party pursuant to this Part. Appraisal testimony offered to prove the valuation asserted may only be given by a preparer of the documented appraisal whose signature appears on the document." 86 Ill. Adm. Code 1910.67(l) (2018).

PTAB Rule 1910.92(a) provides that "[e]ach hearing shall be conducted in a manner best calculated to conform to substantial justice." 86 Ill. Adm. Code 1910.92(a) (2018). PTAB Rule 1910.50(c) requires that the PTAB's decisions "be based on equity and the weight of the evidence." 86 Ill. Adm. Code 1910.50(c) (2018).

¶ 88    However, an administrative agency has broad discretion in the conduct of its hearings, and an administrative agency abuses its discretion only when "no reasonable person would take the position [it] adopted" or it has "act[ed] arbitrarily, fail[ed] to employ conscientious judgment, [or] ignore[d] recognized principles of law." *John J. Moroney*, 2013 IL App (1st) 120493, ¶ 50. The "PTAB has authority to interpret and apply its own rules, and a reviewing court will not interfere with an administrative agency's application of its rule unless 'the interpretation is plainly erroneous or inconsistent with long-settled constructions.' " *West Loop Associates, LLC v. Property Tax Appeal Board*, 2017 IL App (1st) 151998, ¶ 40 (quoting *Lake County Board of Review v. Property Tax Appeal Board*, 140 Ill. App. 3d 1042, 1051 (1986)).

¶ 89    Here, the School District objected to Beach's testimony regarding the appraisals on the basis that the testimony was irrelevant and in violation of the PTAB rule regarding appraisal testimony. In response, Grand Tower LLC asserted that it offered Beach's testimony regarding the appraisals to explain how the subject property received an allocated price of $47 million in the portfolio sale, not to demonstrate the subject property's fair market value. The ALJ agreed with Grand Tower LLC and overruled the objection, stating that "[t]he testimony here is on the acquisition of the property and what they considered and what they used and how they came about to determine the price, whether it be allocated or total price for the portfolio." Grand Tower LLC sought to prove that the fair market value of the subject property was $20 million based on Reilly's appraisal, not $47 million based on the portfolio sale. Because the PTAB could have reasonably concluded that Beach's testimony was not offered to prove the valuation asserted, the PTAB did not abuse its discretion in overruling the School District's objection.

¶ 90    Again, even assuming the PTAB improperly permitted appraisal testimony at the hearing, petitioners have not shown "demonstrable prejudice" (*John J. Maroney*, 2013 IL App (1st)

33

120493, ¶ 50), or that the ruling materially affected petitioners' rights, causing substantial injustice (735 ILCS 5/3-111(b) (West 2018)). As noted, the PTAB relied on Reilly's appraisal in determining the value of the subject property. The PTAB compared the price allocated to the subject property in the portfolio sale to the appraisers' estimated values, but it made no specific reference to Beach's testimony regarding the appraisals in its decision. The PTAB expressly stated that it placed little weight on the portfolio sale in reaching its decision. Thus, in our view, petitioners have not shown that the admission of Beach's testimony regarding the appraisals, even if improper, resulted in demonstrable prejudice so as to require reversal of the PTAB's decision.

¶ 91    3. Valuation

¶ 92    Lastly, petitioners argue that the PTAB erred as a matter of law when it valued the subject property based on the prior business decisions of Ameren rather than the subject property's income-producing capabilities. We disagree.

¶ 93    As an initial matter, we must address petitioners' assertion that this argument presents a question of law subject to *de novo* review. To properly address petitioners' assertion, we will first summarize Illinois law on the valuation of real property for taxation purposes. Our colleagues in the Second District provided the following summary, which we find instructive:

> "Illinois law requires that all real property be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale where the owner is ready, willing, and able to sell but is not compelled to do so, and the buyer is likewise ready, willing, and able to buy but is not forced to do so. [Citation.] 'Fair cash value' is synonymous with fair market value, and an arm's-length sales transaction is the best evidence thereof. [Citation.] There are three basic methods of evaluating real property: (1) the sales comparison approach; (2) the income approach; and (3) the reproduction cost approach. [Citation.] In

34

the absence of market value established by a contemporaneous arm's-length sale, the sales comparison approach is the preferred method and should be used when market data are available. [Citation.]" *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43.

¶ 94 "When faced with challenges to a PTAB decision reducing a taxpayer's assessment, courts have noted that 'we are not charged with the responsibility of determining the market value of the subject property. Rather, the central question before us is whether the PTAB's decision to reduce petitioner's tax assessments *** was correct.' " *Kankakee County Board of Review v. Property Tax Appeal Board*, 2012 IL App (3d) 110045, ¶ 12 (quoting *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill. 2d 36, 50 (2007); *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 479 (2008)). If any evidence supports PTAB's findings, its decision must be sustained on review. *Du Page County Board of Review v. Property Tax Appeal Board*, 284 Ill. App. 3d 649, 655 (1996); see also *Kankakee County Board of Review*, 2012 IL App (3d) 110045, ¶¶ 18-19.

¶ 95 Petitioners seek to avoid the deferential manifest-weight-of-the-evidence standard by arguing that the PTAB erred as a matter of law when it valued the subject property based on Ameren's prior business decisions rather than the subject property's income-producing capabilities. As petitioners correctly note, the issue of whether the PTAB considered appraisals that utilized the proper methodology for valuation presents a question law that is reviewed *de novo*. See *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 479 (2008). After careful review, we conclude that petitioners' arguments do not raise the issue of whether the PTAB considered an appraisal that utilized the proper methodology.

35

¶ 96    "We have traditionally conducted *de novo* review on the question of whether an appraiser properly ignored the preferred methodology—the sales comparison methodology—in a given case, and we have rejected the refusal to use that methodology when market data was available to make sales comparisons." *Gateway-Walden, LLC v. Pappas*, 2018 IL App (1st) 162714, ¶ 62 (citing *Kraft Foods*, 2013 IL App (2d) 121031, ¶¶ 43-44). "We have upheld an appraiser's refusal to use the sales comparison approach only when sales data was unavailable due to the unique nature of the property—a fairly rare occurrence." *Id.* ¶ 63 (citing *Kendall County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 735, 741 (2003)).

¶ 97    Here, however, petitioners essentially argue that the PTAB erred by relying on Reilly's appraisal in determining the value of the subject property. Petitioners do not argue that Reilly improperly ignored the cost and sales comparison approaches to value or that Reilly's reliance on the income approach was improper. Petitioners, instead, argue that the PTAB erred by relying on Reilly's appraisal because Reilly "incorrectly valued" the subject property based on operations under Ameren's prior ownership without considering the subject property's income-producing capabilities. Petitioners also argue that the PTAB, in accepting Reilly's appraisal, valued the subject property as "junk" based on the subject property's "worst years" under Ameren's ownership while disregarding the subject property's "best performing years and full income potential."

¶ 98    Petitioners' arguments challenge the elements Reilly used in his income approach to value. We note that petitioners were able to highlight various inconsistencies and irregularities in Reilly's appraisal on cross-examination and through the testimony of Sosa. In our view, any inconsistencies or irregularities went to the weight of Reilly's opinions, not the admissibility of his opinions. This court is "not required to delve into the minutiae of expert testimony or make credibility

36

determinations appropriately left to the trier of fact." *Gateway-Walden, LLC*, 2018 IL App (1st) 162714, ¶ 64. Thus, we review the PTAB's decision under the manifest-weight-of-the-evidence standard of review.

¶ 99 We note that petitioners do not make the alternative argument that the PTAB's decision was against the manifest weight of the evidence. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); see also *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010) ("Consistent with the plain language of the rule, this court has repeatedly held that the failure to argue a point in the appellant's opening brief results in forfeiture of the issue."). Thus, petitioners have forfeited review of this issue.

¶ 100 Forfeiture aside, in applying this deferential standard, we cannot say that the PTAB's decision was against the manifest weight of the evidence. The PTAB, in its 83-page decision, provided a detailed review of both Reilly and Lagassa's appraisals, including the three methods of valuation they considered in determining the value of the subject property. The PTAB carefully considered the evidence presented at the hearing and found Reilly's appraisal more persuasive than Lagassa's appraisal. The PTAB concluded that Reilly "was able to sufficiently defend his methodologies through testimony" which "was supported by the testimony of other witnesses." In other words, the parties presented conflicting appraisals as evidence of the market value and the PTAB found Reilly's appraisal more credible and better supported by the evidence. See *National City Bank of Michigan/Illinois*, 331 Ill. App. 3d at 1042 ("A reviewing court is not to reweigh the evidence, reassess the credibility of the witnesses, or substitute its judgment for that of the agency." (citing *Residential Real Estate Co.*, 188 Ill. App. 3d 232)). Regardless of whether this court may

have reached a different conclusion, we cannot say that the PTAB's decision to credit Reilly's appraisal over Lagassa's appraisal was against the manifest weight of the evidence.

¶ 101 Petitioners acknowledge that Ameren "engaged in substandard maintenance practices which led to longer start times and maintenance related issues which prevented the plant from operating at its full capabilities." Petitioners also acknowledge that after Grand Tower LLC acquired the subject property in January 2014, Grand Tower LLC "took steps to get [the subject property] up and running at optimal capacity by curing the issues that were causing start-up and performance issues." The parties presented conflicting testimony regarding the condition of the subject property in 2014 and 2015; however, it is clear from the record that the necessary repairs were made over time.

¶ 102 In addition, the PTAB found that, due to the market the subject property presently competes in, the subject property was limited to operating as a peaking plant in 2014 and 2015, which limited the subject property's ability to produce revenue. The PTAB acknowledged, however, that the utility of the subject property may increase in future years. The PTAB concluded that Reilly's income approach to value incorporated the operational history of the subject property as a peaking plant in the MISO market and, thus, Reilly better represented the value of the subject property under the income approach. As a result, the PTAB relied on Reilly's appraisal in finding that the fair market value of the subject property was $20 million. Because there was evidence supporting the PTAB's finding that the subject property was overvalued in tax years 2014 and 2015, we cannot say the PTAB's decision was against the manifest weight of the evidence.

¶ 103                                         III. Conclusion

¶ 104 For the reasons stated, we affirm the PTAB's decisions denying petitioners' motion to dismiss and reducing the assessment value of the subject property.

¶ 105  Affirmed.

| | |
|---|---|
| **Cite as:** | *Shawnee Community Unit School District No. 84, et al. v. Illinois Property Tax Appeal Board, et al.,* 2022 IL App (5th) 190266 |
| **Decision Under Review:** | Appeal from the Illinois Property Tax Appeal Board, Nos. 14-03445.001-I-3 through 14-03445.009-I-3 and 15-00452.001-I-3 through 15-00452.010-I-3; the Hon. Edwin E. Boggess, Judge, presiding. |
| **Attorneys for Appellants:** | Scott L. Ginsburg, Jessica L. Knox, Katie Zumalt-Rogers, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., 55 West Monroe Street, Suite 800, Chicago, IL 60603; Clyde L. Kuehn, Natalie T. Lorenz, Mathis, Marifian & Richter, Ltd., 23 Public Square, Suite 300, Belleville, IL 62220, for appellants. |
| **Attorneys for Appellee:** | John T. Moran, The Moran Law Group, 566 West Lake Street, Suite 101, Chicago, IL 60661; Patrick C. Doody, Law Offices of Patrick C. Doody, 70 West Madison, Suite 2060, Chicago, IL 60602, for appellee, Grand Tower Energy Center, LLC |